**FROEHLICH**

v.

**OHIO DEPARTMENT OF MENTAL HEALTH.**

2003-Ohio-1277.]

Court of Claims of Ohio.

No. 2001–08129.

Decided March 5, 2003.

2

William J. O'Malley and Carla E. Oglesbee, for plaintiff.

Jim Petro, Attorney General, and Velda Ḳ. Hofacker–Carr, Assistant Attorney General, for defendant.

J. Warren Bettis, Judge.

{¶ 1}   Plaintiff Patricia Froehlich brought this action against defendant, Ohio Department of Mental Health, alleging claims of malicious criminal prosecution,

intentional infliction of emotional distress, and defamation. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Plaintiff, a registered nurse, was employed by Cambridge Psychiatric Hospital ("CPH")[1] beginning in May 1988. She was hired as a Psychiatric/Mental Retardation Nurse and was promoted to the position of Psychiatric Nurse Coordinator in October 1996. She consistently received positive evaluations throughout her employment, and she was never subjected to discipline for any reason. However, plaintiff was terminated in July 2000, as a result of an incident of alleged patient abuse that had occurred in February of that year. In addition, attempts were made to obtain a felony indictment against her.

{¶ 3} The incident that led to plaintiff's discharge involved a patient who, for confidentiality reasons, was identified only as "Patient H." On February 7, 2000, Patient H feigned a suicide attempt by tying one end of a sheet loosely around her neck, throwing the other end over a handrail located beside the toilet in her bathroom, and then lying on the floor. The conduct was not uncommon for this particular patient; she frequently threatened suicide and often spoke of wanting to die. She was also known to be self-abusive, and she routinely engaged in attention-seeking behavior.

{¶ 4} On this occasion, Patient H had gone to the nurses' station at approximately 9:40 p.m. and announced that she wished to tell the staff goodbye because she was going to kill herself. The comment was so typical of the patient that staff simply directed her to go watch television, go to the dining area, or to involve herself in something that would not isolate her from others. Instead, the patient went to her room.

{¶ 5} Staff member Thomas Vaughn followed Patient H to her room and found her lying on the floor with the sheet around her neck. He immediately reported what he had seen to plaintiff. Plaintiff was the staff supervisor and accordingly called for CPH security, whereupon she proceeded to the patient's room. Nurse Roberta Wilson, LPN, and Mary Hillman also responded. They found Patient H to be breathing normally and in no apparent distress. However, she could not be readily examined because she was wedged between the toilet and the bathroom wall. When plaintiff asked Patient H to stand up, she would not respond and essentially "played dead." Although accounts vary, the patient reportedly attempted to strike plaintiff when she knelt to remove the sheet from the patient's neck; there is also some evidence that she pulled one leg back as if to kick Hillman in the face.

---

1. CPH is a member of defendant Ohio Department of Mental Health's Appalachian Psychiatric Healthcare System.

{¶ 6} By this time, staff members Cory Taylor and Kenneth Meighen had arrived from other hospital units and plaintiff directed them to pull the patient to the adjoining bedroom where a physical examination could be performed. Patient H continued to resist direction and assistance, remaining limp and intentionally mute. At the time, the patient was 5 feet 4 inches tall and weighed 238 pounds. Because Taylor and Meighen were physically strong enough to lift Patient H, plaintiff directed them to move the patient to the quiet (or seclusion) room. The men did so by placing their hands beneath her underarms, partly lifting the patient off the floor, and, with the patient facing backwards, away from them, pulled her down the hall. Accounts also vary as to whether plaintiff directed the men to "drag" the patient and whether the patient's buttocks were in contact with the floor while she was being moved. By the time the men reached the quiet room, security officers had arrived to assist in lifting the patient onto a bed where she could be examined.

{¶ 7} In accordance with hospital protocol, plaintiff telephoned a hospital physician, Dr. Vellanki, to relate the course of events. Based upon the information related, the doctor ordered that Patient H be confined with four-point restraints and stated that he would be over to see her shortly. The doctor arrived at approximately 10:30 p.m. After speaking with the patient, Dr. Vellanki ordered an injection of Loxitane. In his statement to investigators, he indicated that the injection was ordered "to reduce the patient's agitation" and "enable her to be released from restraints." Nurse Wilson administered the Loxitane injection in the patient's buttock. Approximately 45 to 50 minutes later, the restraints were removed and Patient H was placed on one-to-one observation for the rest of the night. Plaintiff's work shift ended at 11:00 p.m.

{¶ 8} The following morning, Patient H complained of soreness on her buttocks. Nurse Lisa Archer, RN, examined the patient and filled out an "Incident Notification Report." Her report states that Patient H told her, "[I] was [lying] on the floor last evening and the staff drug me to the quiet room and put me in restraints." Nurse Archer noted a "reddened abrasion on center of buttocks" that was "approximately 24cm by 14cm with skin intact and no drainage." She encouraged the patient to take a cool shower to ease any discomfort.

{¶ 9} The next day, Patient H spoke to patient advocate Richard Dagenhart, CRA, LSW, who also issued an Incident Notification Report. That report states: "[The patient] informed me today that she received injuries from being dragged to the seclusion by staff and the police dept. She feels she was physically abused by staff and that her rights were violated because she was not treated with dignity and respect. She showed me her buttocks [which] appeared to have rug burns on them * * *."

{¶ 10} As a result of the patient's complaint, as documented in the two incident reports, an investigation ensued. An internal investigation was conducted by CPH's security and, because patient abuse may be considered a criminal offense, the Ohio State Highway Patrol ("OSHP") was notified.

{¶ 11} When the OSHP completed its investigation, a meeting was arranged with the county prosecutor. Ultimately, plaintiff was charged with abuse based upon alleged "dragging" of Patient H on her buttocks. The case was taken before a grand jury on March 20, 2000; however, the jurors requested additional information and witnesses. On April 11, 2000, when the case was presented for the second time, the grand jury returned a no-bill on the indictment. Subsequently, CPH staff, including the Hospital Nursing Supervisor, the Chief of Hospital Security, and a Lieutenant on the Hospital Security Guard met with the OSHP to discuss what further steps should be taken. It was agreed that CPH security and the OSHP would approach the prosecutor as to whether a second charge could be presented, this one based upon an allegation that plaintiff provided false information to Dr. Vellanki in order to obtain authority for restraints.

{¶ 12} The CPH security and the OSHP remained in contact throughout the spring and summer of 2000. Plaintiff continued to be employed in her supervisory position.[2] Plaintiff was not advised of the grand jury proceedings, but learned of them when her co-workers told her that they had been subpoenaed to testify. She heard of the no-bill only through rumors. Plaintiff had no reason to believe that the matter had not been resolved until she received a notice of a Pre–Disciplinary Conference in mid-June 2000. In July, she was fired; the most severe sanction available under defendant's disciplinary grid, Ohio Adm.Code 5122–3–14. CPH also reported plaintiff to the State Nursing Board, which could have revoked her nursing license if the alleged patient abuse were substantiated.

{¶ 13} After losing her job, plaintiff filed an application for unemployment benefits, which CPH challenged. The Unemployment Compensation Board of Review found that plaintiff was unfairly terminated and granted her application for benefits. Plaintiff also filed a grievance and participated in arbitration proceedings in December 2000. The arbitrator ruled, in February 2001, that plaintiff had been unfairly terminated. It was ordered that she be reinstated with back pay; however, the arbitrator did recommend that a written reprimand be placed in plaintiff's file for failing to properly chart the February incident. Finally, the nursing board looked into the matter and elected to drop its investigation.

---

2. Patient H was moved to another unit the day after her abuse allegation was made.

{¶ 14} Throughout plaintiff's unemployment and grievance proceedings, CPH security and the OSHP continued to stay in contact concerning the presentation of the second abuse allegation to a grand jury. Initially, the prosecutor suggested that presenting the matter to the same grand jury might appear to be a "witch hunt" on the part of CPH. Later, it was decided that a second presentation would be risky during the pendency of plaintiff's grievance; it was thought that it would have a negative impact on the arbitrator's decision if a second no-bill were returned. On March 7, 2001, after the arbitrator's decision had been issued, the CPH Security Chief and an OSHP Trooper met with the county prosecutor to discuss again the presentation of the second charge. The question whether to pursue the matter as a misdemeanor charge was also discussed. Eventually, the prosecutor sent the OSHP a letter, in May 2001, stating that he would not recommend any further charges against plaintiff.

{¶ 15} Plaintiff never returned to work for CPH; she had obtained other employment approximately three months after her termination. However, that job was in Columbus, Ohio, and paid $15 less per hour than her job at CPH. She testified that, in her opinion, her professional reputation in the community had been seriously compromised and she did not feel that she could continue working in her hometown.

{¶ 16} Plaintiff's first cause of action is for malicious criminal prosecution. In order to prevail on this claim, plaintiff must prove that there was (1) malice in initiating or continuing the prosecution, (2) lack of probable cause to institute the proceedings, and (3) termination of the prosecution in favor of the accused. *Trussell v. Gen. Motors Corp.* (1990), 53 Ohio St.3d 142, 144, 559 N.E.2d 732.

{¶ 17} In this case, defendant maintains that plaintiff cannot establish any of the above-cited elements by a preponderance of the evidence. First, defendant argues that a presentation to a grand jury does not constitute a "prosecution" as contemplated by law. Defendant relies primarily upon *Trussell,* supra, in support of this contention. However, the court does not agree with defendant's interpretation of that case.

{¶ 18} In *Trussell,* the court stated: "The primary issue before us is this: must the plaintiff show an arrest or seizure in order to maintain an action for malicious prosecution founded on a prior criminal proceeding? In order to resolve this issue, we must revisit and clarify our prior pronouncements in this area." The court went on to distinguish between cases of malicious civil prosecution and those of malicious criminal prosecution. It concluded that in cases of malicious criminal prosecution, damage to a person's dignity or reputation occurs "whether the plaintiff is arrested or, as in the instant case, haled into

court on a summons. Unlike the victim of malicious civil prosecution, the victim of false criminal charges does not have the remedies provided by Civ.R. 11. Accordingly, we take this opportunity to clarify and reaffirm the existing law. * * * Arrest of the plaintiff or seizure of his property is not a necessary element of the tort of malicious prosecution."

{¶ 19} Based upon the holding in *Trussell*, the court finds that seeking a felony indictment from a grand jury is sufficient to form a basis for this cause of action. The court finds that this is particularly true here because the alleged offense, physical abuse of a patient, is by its very nature injurious to a nurse's dignity and professional reputation. Therefore, the court finds that plaintiff has established the first element of this cause of action.

{¶ 20} The next two elements of the cause of action will be addressed together inasmuch as "malice," in this context, may be inferred where the evidence demonstrates a lack of probable cause. *Garza v. Clarion Hotel, Inc.* (1997), 119 Ohio App.3d 478, 482, 695 N.E.2d 811. "Malice," as the term is used in a claim of malicious prosecution, refers to "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield Twp.* (1990), 56 Ohio St.3d 82, 85, 564 N.E.2d 440. Probable cause exists when the facts and circumstances are such that a cautious individual would be warranted in the belief that the person accused is guilty of the offense with which he or she is charged. *Huber v. O'Neill* (1981), 66 Ohio St.2d 28, 20 O.O.3d 17, 419 N.E.2d 10; *McFinley v. Bethesda Oak Hosp.* (1992), 79 Ohio App.3d 613, 617, 607 N.E.2d 936.

{¶ 21} With respect to probable cause, defendant argues that ample evidence was provided to both CPH security and the OSHP to warrant a reasonable belief that plaintiff had committed two acts of patient abuse: (1) allowing Patient H to be "dragged" and (2) providing inaccurate information to Dr. Vellanki in order to place the patient in restraints. According to defendant, plaintiff could have waited for CPH security to assist in moving the patient, and she could have ordered that Patient H be pulled to the quiet room on a blanket. Defendant also contends that plaintiff lied to Dr. Vellanki by reporting that Patient H was "combative." It is defendant's position that the patient was "non-responsive" (rather than aggressive or combative), and that restraints were not necessary under the circumstances.

{¶ 22} Additionally, defendant maintains that it is shielded from liability because it was solely within the prosecutor's discretion to present the matter to the grand jury. As to malice, defendant contends that there is no such evidence and that it acted strictly in accordance with its duty to protect its patients and investigate allegations of abuse.

{¶ 23} In determining whether a criminal prosecution was initiated improperly, the court must examine the information that prompted the decision to prosecute. *Mayes v. Columbus* (1995), 105 Ohio App.3d 728, 737, 664 N.E.2d 1340. In this case, the court disagrees with the contention that ample evidence of abuse was provided to the investigating officers. In the court's view, the February 7, 2000 incident cannot be viewed in isolation. While mindful of defendant's policy that each decision to move a patient to seclusion, or to apply restraints, must be based on the particular conduct displayed, rather than the patient's past history, the court finds that a certain amount of professional judgment must also be called into play. That type of judgment necessarily involves information culled from prior interactions with the patient and knowledge of the patient's psychological condition.

{¶ 24} Here, the medical records reveal that Patient H had been hospitalized many times and was well known to CPH staff. Her psychological evaluation for this admission (January 29, 2000, to April 7, 2000) was that of "Schizoaffective Disorder, depressed" and "Borderline Personality Disorder." The evaluation, dated March 7, 2000, notes that "[h]er behavior here has been erratic and combative. She has been in restraints 17 times since admission. Often restraints are renewed because of her unwillingness or inability to calm down and verbalize control over her behavior." The patient's acts of violence against staff and other patients is well documented; likewise, her attempts to seek attention through threatened suicide, self-abuse or abuse of others. Obviously, she had been in restraints many times, both before and after the February 7 incident. Other evidence shows that, in the course of her many admissions, she had been in restraints hundreds of times, sometimes two or three times a day. In sum, the court is hard-pressed to see what, if anything, was different about this one occasion. Plaintiff's testimony that the use of restraints on Patient H was "usually the only thing that works for her if she has gone this far" was credible and, to the court, represents exactly the type of professional judgment that she was required to make in her position.

{¶ 25} Regarding the specifics of the incident, the court's examination of the statements taken by the investigators reveals that there is no clear answer to the questions of whether Patient H was "dragged," whether her buttocks were on the floor, or whether plaintiff related misinformation to Dr. Vellanki. The descriptions of the witnesses varied, and individuals who were present at the same time gave different accounts. It is not clear how the patient sustained the injury to her buttocks. Nurse Wilson, and other witnesses present when she administered the Loxitane injection, reported seeing no abrasion or other injury to patient's buttocks at that time. In the court's view, it is unlikely, even if Patient H had been "dragged" on her buttocks, that she would have received the extent of

abrasion shown in the photographic exhibits. Judging from her medical records and the charting of events following the incident, the injury appears more likely to have been the result of the patient's own self-abuse.

{¶ 26} Although some questions remain unanswered, the court does not find that the totality of the evidence points to plaintiff's guilt. Rather, the court finds that the evidence, coupled with defendant's knowledge of the patient's history and behavior, militates against a finding that plaintiff committed any act of patient abuse. Simply stated, the court cannot find from the evidence presented to CPH security, to the OSHP, or at trial that a cautious individual would be warranted in the belief that plaintiff was guilty of the offenses charged.

{¶ 27} Having found that probable cause did not exist, the court is further compelled to find that defendant acted with malice. While there was no testimony regarding the state of mind of the investigating officers or CPH decision makers, the court is persuaded by the totality of the evidence that the criminal charges were pursued primarily for some purpose other than bringing plaintiff to justice. There is nothing in plaintiff's employment record to indicate that she had ever been anything other than a consummate professional and devoted employee. In fact, she received an excellent review in June 2000, which was during the same time that CPH was seeking her termination. There is no evidence that plaintiff was behaving, on February 7, 2000, in any way that would indicate a loss of temper or a lapse of good judgment. She had a great deal of experience with Patient H, and there is nothing in the evidence to show that she suddenly deviated from professional conduct on that one occasion that was any different from dozens of others. The court is at a loss to find any reason why defendant went to such lengths to terminate plaintiff's employment. Under such circumstances, and considering that at least four other administrative and/or quasi-judicial decisions on the matter were rendered in favor of plaintiff, the court can only infer a malicious purpose. See *Garza,* supra.

{¶ 28} Finally, the court does not find that the decision to bring the charges to the grand jury was solely that of the prosecutor. The person(s) whose information or accusation led the prosecutor to initiate the proceedings can be held liable in a variety of circumstances. Specifically, a person "who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer *if it is left entirely to his discretion to initiate the proceedings or not.*" (Emphasis added.) Restatement of the Law 2d, Torts (1965) 409, Section 653, Comment *g.* In the present case, the court is persuaded by the evidence that CPH security and decision-making

personnel actively sought the prosecution of plaintiff by indictment through direct contact with the OSHP and the prosecutor. The totality of the evidence does not support defendant's contention that the matter was benignly turned over to the prosecutor and left entirely to his discretion.

{¶ 29} For these reasons, the court concludes that plaintiff has proven her claim of malicious criminal prosecution by a preponderance of the evidence.

{¶ 30} Plaintiff's second claim is for intentional infliction of emotional distress. In order to establish that claim, it is not enough that defendant's conduct has been found to be "malicious." Rather, the Supreme Court of Ohio has held that "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' * * *" *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 374–375, 6 OBR 421, 453 N.E.2d 666. Based upon the facts as set forth above, the court does not find that defendant's conduct toward plaintiff was extreme or "outrageous" as contemplated by the case law. Therefore, plaintiff has failed to establish liability on the part of defendant for intentional infliction of emotional distress.

{¶ 31} Plaintiff's third claim is for defamation. In order to establish this claim, plaintiff must show a false and defamatory statement made by defendant, a publication of that statement, and fault on the part of defendant amounting to, at least, negligence. *Black v. Cleveland Police Dept.* (1994), 96 Ohio App.3d 84, 644 N.E.2d 682. Here, the court finds that the facts and law do not support this claim. There is simply no evidentiary support for the contention that CPH disseminated false information to plaintiff's co-workers, or within her community, regarding the basis for her termination. To the contrary, all of the evidence suggests that word of plaintiff's termination was spread by her own conversations with co-workers, and her co-workers conversations among themselves. Absent a "publication" of some sort, made by defendant, plaintiff cannot establish a prima facie case of defamation. Therefore, defendant cannot be held liable on this claim.

{¶ 32} Defendant argues in the alternative that plaintiff's claims are barred by the one-year statute of limitations set forth under R.C. 2305.11. Specifically, defendant argues that plaintiff's cause of action for malicious prosecution accrued, at the latest, in April 2000 when the grand jury issued its no-bill. The court has found that defendant continued to pursue criminal charges at least through May 2001, when the prosecutor notified the OSHP that he would not recommend any further charges against plaintiff. Accordingly, plaintiff's August 8, 2001 complaint was timely filed. Likewise, because all three claims are based

upon the same allegations, the court finds that the claims for intentional infliction of emotional distress and defamation were also timely filed.

{¶ 33} In conclusion, judgment shall be granted in favor of plaintiff on her claim of malicious criminal prosecution. However, the preponderance of the evidence fails to demonstrate either intentional infliction of emotional distress or defamation.

Judgment accordingly.

J. WARREN BETTIS, J., retired, of the Columbiana County Court of Common Pleas, sitting by assignment.