[Cite as *Groen v. Children's Hosp. Med. Ctr.*, 2012-Ohio-2815.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| PAMELA GROEN, | : | APPEAL NO. C-100835 |
| | | TRIAL NO. A-0907904 |
| Plaintiff-Appellant, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | : | |
| CHILDREN'S HOSPITAL | : | |
| MEDICAL CENTER, | | |
| | : | |
| Defendant-Appellee. | | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 22, 2012

*Schwartz Manes Ruby & Slovin, William S. Wyler* and *Hallie Borellis* for Plaintiff-Appellant,

*Taft Stettinius & Hollister LLP, W. Stuart Dornette* and *Ryan M. Bednarczuk*, for Defendant-Appellee,

Please note: This case has been removed from the accelerated calendar.

**J. HOWARD SUNDERMANN**, Judge.

{¶1}   Plaintiff-appellant Pamela Groen appeals from the trial court's entry granting summary judgment in favor of defendant-appellee Children's Hospital Medical Center ("CHMC") on Groen's claims that she was entitled to receive a distribution of proceeds under a Policy on Inventions, Patents, and Intellectual Property ("IP Policy") with CHMC for one patented assay and five unpatented assays she co-invented during her employment at CHMC.  Because the IP Policy does not provide for such compensation, we affirm the trial court's decision granting summary judgment to CHMC.

### I. Groen's Work at CHMC and the IP Policy

{¶2}   Groen, an employee at CHMC since 1993, works in the molecular pathology lab.   While in CHMC's employ, Groen collaborated with her supervisor Dr. David Witte to develop an assay for tracking the progress of the Epstein Barr Virus ("EBV") in post-organ-transplant patients.  In January 2001, Groen signed an invention disclosure form covering the EBV assay and submitted it to CHMC's Office of Technology Transfer. The document confirmed CHMC's ownership of the invention.  CHMC subsequently filed a patent application for the invention, and on September 14, 2004, the Patent Office issued to CHMC a patent entitled "Quantitative Epstein Barr Virus PCR Rapid Assay."

{¶3}   When it filed the patent application, CHMC was discussing with a third party a potential licensing of the test.  Those talks never resulted in a license agreement, and CHMC did not license the test to any other party.  CHMC continues, however, to use the test in-house.  In addition to the EBV assay, Groen has developed

2

five other assays, none of which CHMC has patented or licensed to a third party. But CHMC does use these assays in its treatment of patients.

{¶4} At the time Groen invented the assays, CHMC maintained an IP Policy. Over the years, Groen has made numerous inquiries about whether she would be paid for her inventions under the IP Policy. Ultimately, CHMC refused to make any payments to Groen for its in-house use of the assays.

## II. Groen's Lawsuit Against CHMC

{¶5} Groen then sued CHMC, claiming, among other things, breach of contract based on the IP Policy. Groen claimed that under the IP Policy, she was entitled to compensation for CHMC's use of the EBV assay. Following the trial court's dismissal of Groen's claims for mutual mistake of fact and unjust enrichment, Groen amended her complaint to include three additional claims: retaliation in violation of public policy, tortious interference with a business relationship, and a second contract claim. Groen claimed CHMC had also breached the IP Policy by failing to pay her for its in-house use of the five unpatented assays she had co-invented.

{¶6} CHMC moved to dismiss Groen's claims for retaliation in violation of public policy and tortious interference with a business relationship. Following a hearing, the trial court dismissed her retaliation claim. Shortly thereafter, CHMC moved for summary judgment on Groen's contract claims. After briefing and oral argument, the trial court determined that there was no ambiguity in the IP Policy, and entered an order granting CHMC's motion for summary judgment. Groen voluntarily dismissed her remaining claims against CHMC without prejudice, and filed a notice of appeal from the trial court's entry granting summary judgment on her contract claims.

3

{¶7}  CHMC filed a motion to dismiss Groen's appeal, arguing that the Ohio Supreme Court's decision in *Pattison v. W.W. Grainger, Inc.*, 120 Ohio St.3d 142, 2008-Ohio-5276, 897 N.E.2d 126, precluded Groen from dismissing her remaining claims without prejudice so as to convert the trial court's entry of partial summary judgment on her contract claims into a final appealable order. Groen filed an amended notice of dismissal, dismissing her remaining claims against CHMC with prejudice, as well as a memorandum opposing CHMC's motion to dismiss her appeal.  We overruled CHMC's motion to dismiss Groen's appeal.

### III. Jurisdiction to Entertain Groen's Appeal

{¶8}  In its merit brief, CHMC persists in arguing that this court lacks jurisdiction to entertain Groen's appeal because (1) the trial court's entry granting summary judgment on Groen's contract claims lacks Civ.R.54(B) certification; and (2) the Ohio Supreme Court's decision in *Pattison* precludes Groen from voluntarily dismissing her remaining claims against CHMC to create a final appealable order. We disagree.

{¶9}  In *Pattison*, an employee brought two claims against his employer and an another individual: an age discrimination claim and wrongful termination claim based upon a violation of public policy.  *See Pattison v. W. W. Grainger, Inc.* 8th Dist. No. 88556, 2007-Ohio-3081, ¶ 2.  The trial court granted summary judgment to the employer on the age discrimination claim.  The employee appealed. The Eighth District Court of Appeals dismissed the employee's "appeal for want of a final appealable order under Civ.R. 54(B) because the public policy claim remained extant." *Id.*  The employee subsequently filed a notice in the trial court, pursuant to Civ.R.41(A)(1)(a), dismissing his public policy claim without prejudice, and filed a second notice of appeal.  *Id.*

**{¶10}** The Eighth District concluded that it had jurisdiction to entertain the employee's second appeal, but it, nonetheless, dismissed the appeal as untimely. *Id.* at ¶ 3. Acknowledging that its precedent, which permitted a party in cases where the party had received a partial judgment to voluntarily dismiss its remaining claim[s] in a single party suit in order to convert the partial judgment into a final appealable order subject to appeal, "conflicted with the near unanimity" of other appellate districts, the Eighth District certified the conflict to the Ohio Supreme Court. *Id.* at ¶ 8 and ¶ 11, fn. 3.

**{¶11}** The Ohio Supreme Court rejected the Eighth District's position, holding that it not only contravened the plain text of Civ.R.41(A)(1), but also promoted piecemeal appeals, which were burdensome and prejudicial to defendants. The court stated that the text of Civ.R. 41(A) does not permit the voluntary dismissal of less than "all claims asserted by that plaintiff against a defendant." *See Pattison*, 120 Ohio St.3d 142, 2008-Ohio-5276, 897 N.E.2d 126 at ¶ 18. The court further noted that the Eighth District's

position regarding judicial economy and the need to streamline cases suffers in that, were Civ.R.41(A) to be used to dismiss fewer than all of the claims against a certain defendant, a plaintiff could create a final and appealable order as to one issue under Civ.R.41(A) while still saving the dismissed claim to be refiled later. To allow a partial Civ.R.41(A) dismissal is potentially prejudicial to defendants. In cases in which all claims against a party are dismissed without prejudice, there still is the risk of the action being refiled, but the amount of potential litigation that a defendant is subjected to is the same. When an individual claim against a defendant is dismissed without prejudice,

however, the defendant is forced to go through the appeal process and may perhaps still be subjected to the dismissed claim upon refiling. The defendant in that situation is vulnerable to an increased overall burden due to the Civ.R.41 dismissal. *Id.* at ¶ 20.

{¶12} Consequently, the Supreme Court held that "[w]hen a plaintiff has asserted multiple claims against one defendant, and some of those claims have been ruled upon but not converted into a final order pursuant to Civ.R.54(B), the plaintiff may not create a final appealable order by voluntarily dismissing pursuant to Civ.R. 41(A) the remaining claims against the same defendant." *See id.* at ¶ 1; *see also Dohme v. Eurand Am. Inc.*, 121 Ohio St.3d 277, 2009-Ohio-506, 903 N.E.2d 1174.

{¶13} Groen argues that *Pattison* is factually distinguishable. We agree. Because the plaintiff in *Pattison* dismissed his remaining claim without prejudice, the Supreme Court did not discuss the appealability of an order, which disposes of some, but not all of the plaintiff's claims against a defendant, following the plaintiff's voluntarily dismissal with prejudice of her remaining claims against that same defendant. CHMC has not cited, nor has our independent research discovered, any Ohio cases extending *Pattison* beyond its facts. *See, e.g., Mahoney v. HB Emp. Serv., L.L.C.*, 8th Dist. No. 96603, 2011-Ohio-5186; *GRA Water Mgt. Co. v. Univ. of Toledo*, 6th Dist. No. L-11-1014, 2011-Ohio-5034; *P.N. Gilcrest Ltd. Partnership v. Doylestown Family Practice, Inc.*, 9th Dist. No. 09CA0051, 2010-Ohio-1803, ¶ 12; *Myles v. Quail Woods Holdings, LLC*, 8th Dist. No. 92413, 2009-Ohio-5561, ¶ 6.

{¶14} Here, Groen has dismissed her remaining claims against CHMC with prejudice. The Ohio Supreme Court has held that a dismissal with prejudice "operates as an adjudication on the merits and is an appealable order under R.C. 2305.03." *See Tower City Properties v. Cuyahoga Cty. Bd. of Revision*, 49 Ohio

St.3d 67, 69, 551 N.E.2d 122 (1990) (quoting the staff note to Civ.R. 41); *see also Chadwick v. Barbae Lou, Inc.,* 69 Ohio St.2d 222, 226, 431 N.E.2d 660 (1982); *compare Hensley v. Henry*, 61 Ohio St.2d 277, 400 N.E.2d 1352, syllabus (1980) ("Unless Plaintiff's Civ.R.41(A)(1)(a) notice of dismissal operates as an adjudication upon the merits under Civ.R.41(A)(1), it is not a final judgment, order, or proceeding.").

**{¶15}** As a direct consequence of the dismissal with prejudice, Groen has lost forever the opportunity to prove the remaining claims in her amended complaint. Additionally, Groen has not appealed from and is further precluded from contesting the trial court's judgment dismissing her claims against CHMC for unjust enrichment, mutual mistake of fact, and retaliation in violation of public policy.

**{¶16}** By allowing Groen to appeal, following the voluntary dismissal of her remaining claims with prejudice, this court is actually furthering the goal of judicial economy by permitting Groen to forego litigation on the dismissed claims while accepting the risk that if her appeal on the contract claims is unsuccessful the litigation will end.

**{¶17}** Because the trial court's entry granting CHMC partial summary judgment on Groen's two contract claims became a final appealable order when Groen dismissed her remaining claims against CHMC with prejudice, we conclude that we have jurisdiction to consider Groen's appeal. We, therefore, proceed to the merits of her arguments on appeal.

### IV.  *Groen's Breach of Contract Claims*

**{¶18}** In her first assignment of error, Groen argues that the trial court erred in granting CHMC summary judgment on her breach of contract claims.

**{¶19}** We review the trial court's entry of summary judgment de novo, using the same standard that the trial court applied. *Koos v. Central Ohio Cellular, Inc.*, 94 Ohio App.3d 579, 588, 641 N.E.2d 265 (8th Dist. 1994). Summary judgment is appropriate under Civ.R. 56(C) when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Parsons v. Fleming,* 68 Ohio St.3d 509, 511, 1994-Ohio-172, 628 N.E.2d 1377. Contract interpretation, which is at the heart of the judgment in this case, is reviewed de novo. *See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995).

**{¶20}** Groen argues that the trial court erred in granting summary judgment to CHMC on the basis that the IP Policy unambiguously provides for payment to an inventor only when the inventions are commercialized by a third party. We disagree.

**{¶21}** Section VI(A)(2) of the IP Policy provides that "the inventor has the right to * * * receive a share of any licensing fees or royalties received by CHMC from the commercialization of the discovery or invention according to the distribution schedule contained in Section VIII of this Policy." Section VI(D)(5) of the IP Policy, likewise, limits CHMC's obligation to "distribute any licensing fees or royalties received by CHMC for any discovery or invention according to the schedule contained in Section VIII of this Policy." Section VIII of the IP Policy further provides that an inventor is entitled to receive a percentage of the "Cumulative Net Lifetime Proceeds" ("CNLP") for her invention. CNLP is defined as:

Gross revenues or other payments received by CHMC from a licensed technology minus applicable patent fees, other legal fees associated with the technology, fees for patentability and marketability searches, fees arising out of litigation, legal advice or any other fees or costs directly attributable to the invention being licensed. Indirect costs, overhead or other CHMC costs usually associated with operation of CHMC and not directly attributable to the invention shall not be deducted from gross revenues.

**{¶22}** Groen argues that the definition of CNLP is subject to conflicting interpretations and is thus, ambiguous. She reads the phrase "received by CHMC from a licensed technology" as modifying only the phrase "other payments" and not modifying the phrase "gross revenues." Thus, she argues that gross revenues could encompass those gross revenues received by CHMC when it uses an invention in-house while "from a licensed technology" is limited to the "other payments." CHMC argues, on the other hand, that "received by CHMC from a licensed technology" modifies both "gross revenues" and "other payments."

**{¶23}** It is well established that "[a] contract or its terms will be viewed as ambiguous only in the event that the rights and duties imposed on the parties are reasonably subject to conflicting interpretations." *Kern v. Clear Creek Oil Co.,* 149 Ohio App.3d 560, 2002-Ohio-5438, 778 N.E.2d 115, ¶ 20 (5th Dist). Here, the parties' rights and duties are spelled out in Section VI of the IP Policy — the inventor has the right to receive and Children's has the duty to pay a portion of "licensing fees or royalties." In light of those rights and duties, both "gross revenues" and "other payments" as defined in Section VIII of the IP Policy must come "from a licensed

technology." Any other reading is unreasonable in light of the IP Policy as a whole. *See German Fire Ins. Co. v. Roost*, 55 Ohio St. 581, 45 N.E. 1097 (1897), paragraph one of the syllabus.

**{¶24}** Furthermore, the definition of CNLP confirms that the CNLP are proceeds from licensed inventions and nothing more. Groen, who is seeking to recover a percentage of gross revenues received by CHMC, agrees that the adjective "received" modifies both "gross revenues and "other payments." But if "received" modifies both "gross revenues and "other payments," then the phrase that immediately follows it, "from a licensed technology" must also modify "gross revenues" as well as "other payments." The principle of ejusdem generis confirms this reading. It provides that "[w]here general words are used after specific terms, the general words will be limited in their meaning to things of like kind and nature as those specified." *See Dingledy Lumber Co. v. Erie Railroad*, 102 Ohio St. 236, 131 N.E. 723 (1921), syllabus; *see also Kay v. Pennsylvania Rd. Co.*, 156 Ohio St. 503, 103 N.E.2d 751 (1952). The phrase "other payments" refers to types of licensing revenue received from a licensed technology other than gross revenues, such as up-front payments or milestone payments. Thus, from the grammatical context of the first sentence of the definition, read as a whole, CNLP are proceeds from licensed inventions and nothing more.

**{¶25}** The definition of CNLP also ends with a deduction of costs "directly attributable to the invention being licensed." *See* IP Policy VIII(A). The costs to be deducted are fees incurred when an invention is patented and licensed. They do not include the costs incurred for a test used in-house at CHMC. IP Policy VIII(A). This further confirms that CNLP are proceeds from licensed inventions.

{¶26} Finally, there is no ambiguity with respect to any other term that changes our conclusion that Groen is entitled to only a percentage of licensing revenues. While Groen urges this court to attach significance to the fact that not every word in the contract is defined, the absence of definitions does not automatically make the meaning of a term ambiguous. *See Guman Bros. Farm*, 73 Ohio St.3d at 108, 652 N.E.2d 684. Because the IP Policy unambiguously provides that an inventor is entitled to receive payment only from a licensed technology, CHMC was entitled to judgment as a matter of law on Groen's contract claims. We, therefore, overrule her first assignment of error.

{¶27} In her second assignment of error, Groen argues that the trial court erred as a matter of law in holding that Section I of the IP Policy is not part of the contract. We disagree.

{¶28} Section I of the policy, entitled "Preamble," merely lays out the objectives of the policy. One of those objectives is the "equitable distribution of income resulting from the commercialization of novel discoveries * * * between CHMC, TCHRF [The Children's Hospital Research Foundation] and the investigator/inventor." Groen argues that CHMC's in-house use of the tests amounts to "commercialization" for which she is entitled to receive an "equitable distribution of income."

{¶29} But because the preamble merely lays out the objectives of the policy, it is not itself an operative part of the policy. *See Cain Restaurant Co. v. Carrols Corp.*, 273 Fed. Appx. 430, 434, (6th Cir.2008)( noting that "preambles in a contract generally serve to introduce the contract's subject matter rather than set forth the specific rights and obligations of the parties."); *see also Berg v. Berg*, 201 Minn. 179, 275 N.W. 836, 842 (Minn.1937) ("[I]n contracts where a preamble * * * is declaratory

of the purposes and intentions of the parties, it will be looked to in construing the contract * * * but in no sense will it be the basis of a legal and binding obligation of the parties.") The preamble, moreover, concludes with a transition into the actual policy: "the following policy on inventions, patents, and intellectual property has been formulated and adopted." IP Policy, Preamble.

{¶30} Finally, as we read the contract there is nothing inconsistent between the preamble's objective of equitable distribution and the operative provisions of the IP Policy that follow. The generalized phrase "income resulting from commercialization of novel discoveries and inventions" merely echoes the section on the employee-inventor's rights in the body of the IP Policy: "The inventor has the right * * * to receive a share of licensing fees or royalties received by CHMC from the commercialization of the discovery or invention according to the distribution schedule contained in Section VIII of this Policy * * *." IP Policy VI(A)(2). This is the equitable distribution of income referenced in the Preamble.

{¶31} Because the trial court correctly concluded that the Preamble in the IP Policy merely lays out the objectives of the policy and is not an operative part of the contract, we overrule Groen's second assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**DINKELACKER, P.J.,** concurs.
**CUNNINGHAM, J.,** dissents.

**CUNNINGHAM, J.,** dissenting.

{¶32} I respectfully dissent. While I agree with the majority that we have jurisdiction to entertain Groen's appeal, I cannot agree that the IP Policy unambiguously provides compensation to inventors only if there is a licensed technology.

12

**{¶33}** To explain why this case is not ripe for summary judgment, reluctantly I must quote at length from the IP Policy. The policy, drafted by Dr. Joseph Fondacaro, provides in pertinent part:

*I. Preamble*

As a leading institution for patient care and research, Children's Hospital Medical Center (CHMC) and The Children's Hospital Research Foundation (TCHRF) have dedicated their efforts towards the discovery of knowledge that will benefit child health now and in the future. Recognizing that discoveries and inventions of commercial importance are a natural outgrowth of research and without intent to focus the pursuit of research solely on the attainment of patents, *CHMC and TCHRF have a responsibility to:*

\* \* \*

*C. provide equitable distribution of income resulting from the commercialization of novel discoveries and inventions between CHMC, TCHRF, and the investigator, inventor."*

*In recognition and furtherance of these objectives, \* \* \* the following policy on inventions, patents, and intellectual property has been formulated and adopted.*

\* \* \*

Section VI. Rights and Obligations of the Parties

A. Inventor Rights. The inventor has the right to:

\* \* \*

13

2. receive a share of any licensing fees or royalties received by CHMC from the commercialization of the discovery or invention according to the distribution schedule contained in Section VIII of this Policy;

\* \* \*

D. CHMC Obligations. CHMC is obligated to:

\* \* \*

5. distribute any licensing fees or royalties received by CHMC for any discovery or invention according to the schedule in Section VIII of this Policy.

\* \* \*

*Section VIII Distribution of Proceeds:*

*A. For all discoveries or inventions for which CHMC receives proceeds,* CHMC shall deduct all costs (as defined below) pertinent to the technology and not recovered previously in a license agreement. *The remaining net proceeds shall be distributed as set forth below:*

14

| Cumulative Net Lifetime Proceeds | Inventor(s)* | DIVISIONAL | | Research Foundation |
|---|---|---|---|---|
| | | Inventor's(') Laboratory(ies)** | Division(s) ± | |
| 0.$100K | 50% | 15% | 10% | 25% |
| $100K-$300K | 40% | 20% | 15% | 25% |
| >$300K | 30% | 25% | 20% | 25% |

For purposes of this distribution schedule, the following definitions shall apply:

* * *

*Cumulative Net Lifetime Proceeds*: *Gross revenues or other payments received by CHMC from a licensed technology* minus applicable patent filing fees, other legal fees associated with the technology, fees for patentability and marketability searches, fees arising out of litigation, legal advice or any other fees or costs directly attributable to the invention being licensed. *Indirect costs, overhead or other CHMC costs usually associated with operation of CHMC and not directly attributable to the invention shall not be deducted from gross revenues.*

* * *

D. The above distribution schedule shall be adhered to whenever the conditions of Section IV are satisfied and CHMC

15

funds are used to pursue a patent application and/or license agreement. *The distribution schedule shall apply also to revenues received from licensing and commercialization of unpatented technologies.*

(Emphasis added.)

{¶34} The majority holds that an inventor only has a right to compensation under the IP Policy if there is a licensed technology. It relies on the following sentence in the definition of Cumulative Net Lifetime Proceeds [CNLP]: "Gross revenues or other payments received by CHMC from a licensed technology." The majority reasons that the term "licensed technology" must modify both the terms "gross revenues" and "other payments." Thus, it reasons that payment is limited to third party commercialization of an invention.

{¶35} But the term "gross revenue" is not defined in the policy. In its ordinary and usual sense, it would mean all revenues. *See Alexander v. Buckeye Pipeline Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus (holding that words in a contract must be given their plain and ordinary meaning). "Other payments," which is also not defined in the IP Policy, if read without the limiting phrase "from a licensed technology" would make no sense, because all payments would already be accounted for by "gross revenues." Revenues and payments would essentially mean the same thing.

{¶36} On the other hand, if "from a licensed technology" is applied only to "other payments" and not "gross revenues" then the sentence, although awkward, makes sense. "Gross revenues" would apply to fees other than those from a licensed technology and "other payments" would apply to fees from a licensed technology.

16

This is a reasonable interpretation of the provision, particularly in light of the other language employed in Section VIII.

{¶37} In reaching its conclusion that the IP Policy is unambiguous, the majority ignores the first portion of Section VIII of the IP Policy, which begins by stating: "*For all discoveries for which CHMC receives proceeds*, CHMC shall deduct all costs (as defined below) * * *. The remaining net proceeds shall be distributed as set forth below." It also omits from its discussion Section VIII(D) which further states that the distribution schedule applies to "*revenues received from licensing and commercialization of unpatented technologies.*"

{¶38} In interpreting a contract, "[a] court has an obligation to give plain language its ordinary meaning and to refrain from rewriting the contractual agreement of the parties." *Miller v. Marrocco*, 28 Ohio St.3d 438, 439, 504 N.E.2d 67 (1986). It must give meaning to every word used in each provision, and cannot choose to ignore certain words that the drafters had included in the document. *See Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio St.3d 50, 53-54, 524 N.E.2d 441 (1988); *see also Blair v. McDonough*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶ 49 (1st Dist.) (a court must read a contract as a whole).

{¶39} Like the terms "gross revenues," and "other payments," the terms "income," "commercialization," and "proceeds," are not defined in the IP Policy. Because they are undefined, this court must give them their plain and ordinary meaning. *See Goering v. Choicecare Healthcare Plans, Inc.*, 136 Ohio App.3d 22, 24, 735 N.E.2d 936 (1st Dist.1999); *see also Morton Internatl. v. Aetna Cas. & Sur. Co.*, 106 Ohio App.3d 653, 663, 666 N.E.2d 1163 (1st Dist.1995); *Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Commrs.*, 152 Ohio App.3d 95, 2003-Ohio-1277, 786 N.E.2d 921 (7th Dist.).

17

**{¶40}** Commercialize is commonly defined as "[t]o apply methods of business to for profit." "To do, exploit, or make chiefly for financial gain." *American Heritage Dictionary* 371 (4th Ed.2000). "Proceeds" is defined as "[t]he amount of money derived from a commercial or fundraising venture; the yield." *Id.* at 1398. "Income" is defined as "[t]he amount of money or its equivalent received during a period of time in exchange for labor or services, from the sale of goods or property, or as profit from financial investments." *Id.* at 887.

**{¶41}** Although the majority makes a distinction between payments for "in-house use" versus payment for third-party commercialization, the references in Section VIII of the IP Policy to "commercialization" and "proceeds" do not differentiate between income generated in house at CHMC or otherwise. Rather, the IP Policy simply states that CHMC has an obligation to pay inventors revenues based on licensing and commercialization of the assays. Such commercialization could include CHMC's own use of the assays.

**{¶42}** Because Section VIII of the contract is reasonably susceptible to conflicting interpretations, it is ambiguous. *See Matthews v. Morris Sons Co.*, 118 Ohio App.3d 345, 349, 692 N.E.2d 1055 (2nd Dist.1997) (holding that "[a] contract is ambiguous if the rights and duties it imposes on the parties to it are reasonably subject to conflicting interpretations"); *see also United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55, 716 N.E.2d 1201 (2nd Dist.1988).

**{¶43}** Typically the resolution of an ambiguity is a question for the jury, but if the extrinsic evidence is undisputed and reveals the contract to have but one reasonable meaning, summary judgment may be entered. *See Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996); *Cincinnati Ins. Co. v. ACE INA Holdings, Inc.* 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876 (1st

Dist.); *see also Lewis v. Mathes*, 161 Ohio App.3d 1, 2005-Ohio-1975, 829 N.E.2d 318, ¶ 25 (7th Dist.).

**{¶44}** Here, CHMC attached an affidavit from Dr. Fondacaro to its motion for summary judgment. Dr. Fondacaro asserts that the terms "proceeds" and "commercialization" as used in the IP Policy have a "technical" meaning. But these terms are not unique to medical or research institutions. If CHMC had intended for proceeds and commercialization to mean something unique to CHMC's industry, then it should have carefully defined them in the IP Policy. Because CHMC did not define these words in the policy, it cannot now use an affidavit from Dr. Fondacaro to assert that the terms have a "technical" meaning. *See Comtide Holdings, LLC. v. Booth Creek Mgt. Corp.*, S.D. Ohio No. 07-CV-01190, 2011 Ohio U.S. Dist LEXIS 131028 (Nov. 14, 2011)(applying Ohio law); *see also Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 322, 474 N.E.2d 271 (1984).

**{¶45}** Furthermore, the record reveals that the IP Policy was not freely negotiated between CHMC and its employees. Instead, it was drafted by Dr. Fondacaro. Dr. Fondacaro testified that he "cobbled the provisions together" from other intellectual-property policies that he had found on the internet. As a result, any ambiguity in the contract should be strictly construed against CHMC. *See McKay Machine Co. v. Rodman*, 11 Ohio St.2d 77, 80, 228 N.E.2d 304 (1967).

**{¶46}** I also disagree with the majority's conclusion that Section I of the IP Policy is a preamble rather than an operative portion of the IP Policy. Black's Law Dictionary defines a preamble as "an introductory statement in a * * * document explaining the document's basis and objective." 1214 (8th Ed.2004).

**{¶47}** While Section I of the IP Policy is titled "Preamble," it is in effect an operative portion of the parties' agreement. *See Jordan v. Marion Technical*

19

*College*, 3rd Dist. No. 9-90-36, 1991 Ohio App. LEXIS 3866, *2 (Aug. 15, 1991) (holding that section headings are not binding provisions of a contract). Instead of setting the background of the parties' agreement, Section I sets forth the parties' rights and obligations.

{¶48} The section expressly states that it is the "responsibility" of CHMC and the Foundation to "provide [Groen] with an equitable distribution of income resulting from the commercialization of * * * inventions." Notably, Section I does not limit equitable distribution to revenue derived from "license fees" or "royalties." Nor is payment to the inventor limited to revenues from "licensed technologies."

{¶49} In *Orwell Natural Gas Co., Inc. v. PCC Airfoils, LLC*, the plaintiff argued that the first part of the agreement was a preamble, serving as "a perfunctory statement that simply introduces the parties and subject matter." 189 Ohio App.3d 90, 2010-Ohio-3093, 937 N.E.2d 609, ¶ 14 (8th Dist.). The Eighth District Court of Appeals disagreed, holding that "these pages are more than that. They set forth a few material terms, such as location of delivery, and provide the only section that binds [the defendant] to the later terms and conditions * * *." *Id.* Similarly, Section I of the IP Policy sets out the "responsibility" of CHMC to "provide equitable distribution of income resulting from commercialization." It is mandatory language binding CHMC to the later terms and conditions.

{¶50} When CHMC's obligation in Section I to provide inventors with an "equitable distribution of income" is read in conjunction with Section VIII(A) of the IP Policy, delineating the inventor's right to a distribution of the remaining net proceeds for all discoveries and inventions for which CHMC receives proceeds, the terms of the agreement support Groen's argument that "gross revenues" in the definition of CNLP is not limited to proceeds from a licensed technology. Rather,

CHMC has an obligation to equitably distribute income from commercialization from an invention.

{¶51} There is an obvious conflict between the wording in Section VIII and CHMC's obligation in Section I to provide an "equitable distribution" for the commercialization of inventions. Coupled with the contradictory language of Section VIII itself, and the important but undefined terms in that section, I would hold that the IP Policy is ambiguous as to whether an inventor can share in the revenues received from CHMC's internal use of an invention. Because reasonable minds could differ as to whether an inventor could share in CHMC's commercialization of an invention, the use of summary judgment to terminate this litigation was inappropriate. *See Comtide Holdings, LLC.*, 2011 Ohio U.S. Dist LEXIS 131028, at *25 (holding summary judgment inapposite when extrinsic evidence did not conclusively resolve the meaning of an undefined contract term)*; Inland Refuse Transfer*, 15 Ohio St.3d at 322, 474 N.E.2d 271. As a result, I would reverse the trial court's decision granting summary judgment to CHMC, and remand this case for further proceedings in the trial court.

Please note:

The court has recorded its own entry this date.