LEWIS, Appellant,

v.

MATHES et al., Appellees.

[Cite as *Lewis v. Mathes,* 161 Ohio App.3d 1, 2005-Ohio-1975.]

Court of Appeals of Ohio,
Fourth District, Washington County.

No. 04CA13.

Decided April 22, 2005.

Sowash, Carson & Ferrier and Joseph A. Hazelbaker, for appellant.

Mollica, Gall, Sloan & Sillery Co., L.P.A., and Gerald A. Mollica, for appellees.

KLINE, Judge.

{¶ 1} John Lewis appeals the judgment of the Washington County Court of Common Pleas [1] granting summary judgment in favor of Tom D. Mathes, Colleen

---

1. The trial court granted defendant John D. Morris's separate motion for summary judgment on March 24, 2004. No one appealed that judgment.

**4**

Mathes, Timothy Stehley, and S.M.L. Contracting, Inc.[2] Lewis argues that the trial court erred as a matter of law when it determined that he must pay back the money he received as consideration for the purchase of his stock in S.M.L. Contracting, Inc., under a stock-purchase agreement and mutual release in order to avoid the release and maintain a subsequent suit based upon fraud, breach of fiduciary duty, and conversion. Because we find that (1) all of the parties, including Lewis, understood that Lewis would receive a total of only $68,000 pursuant to the terms of the stock-purchase agreement and mutual release and (2) the agreement is not severable, we conclude that Lewis was required to pay back the $68,000 he had received to avoid the release and pursue his claims. Because Lewis does not dispute that he failed to do so, the Matheses, Stehley, and the Corporation are entitled to judgment as a matter of law. Accordingly, we overrule Lewis's sole assignment of error and affirm the trial court's judgment.

I

{¶ 2} In 1997, Stehley, Tom Mathes, and Lewis formed S.M.L. Contracting, Inc., with each owning a one-third interest. As early as 1998, the shareholders had disagreements about how to run the business. Because of the discord, Mathes and Stehley agreed that they should buy out Lewis's one-third interest in the Corporation in 2001. They asked the Corporation's accounting firm to prepare a valuation of the Corporation as of August 31, 2001. The corporate accountant prepared the valuation on November 10, 2001, and determined that a one-third interest for a possible corporate buyout had a value of $68,000 as of August 31, 2001. Accordingly, Mathes and Stehley asked the corporate attorney to prepare an agreement for the Corporation to buy Lewis's one-third interest.

{¶ 3} The corporate attorney prepared a stock-purchase agreement and mutual release that provided that (1) the Corporation would pay $68,000 to Lewis in two cash payments of $34,000 on December 15, 2001, and January 2, 2002, (2) Lewis would escrow his 100 shares of the Corporation to the corporate attorney pending receipt of the two cash payments, at which time the shares would transfer to the corporate treasury, (3) Lewis's execution of the agreement would constitute his resignation as vice president of the Corporation, (4) Lewis would receive his regular compensation through December 31, 2001, and be eligible for unemployment compensation and COBRA health benefits, (5) in exchange for the above

---

2. The complaint and corporate valuation refer to the corporation as "SML Contracting, Inc." and "S.M.L. Contracting, Inc." However, the Stock Purchase Agreement and Mutual Release refers to the corporation as "S.M.L. Contractors, Inc." For consistency, we shall use "S.M.L. Contracting, Inc." or "the Corporation" throughout this decision, except in quoting the agreement.

promises and a payment of $68,000, Lewis would release all claims, rights, causes of action of every kind, nature, or description whatsoever, including employment-termination rights, loss of wages, bonuses, or other consideration against the Corporation, its officers, or owners, (6) the Corporation would release Lewis from any claim it may have against him arising out of his employment by the Corporation, including his use of the Corporation's 1994 Chevrolet one-ton pickup truck that allegedly resulted in $7,000 in damages, and (7) the Corporation would release Lewis from any corporate liability arising out of the corporate operation, hold him harmless, and indemnify him for his loss on any leases or debts of the Corporation for which he personally signed.

{¶ 4} On December 14, 2001, Stehley telephoned Lewis and requested his presence at a meeting. The shareholders met at the corporate attorney's office the next day. There, Mathes and Stehley presented Lewis with the stock-valuation report and the stock-purchase agreement and mutual release. Lewis read the stock-valuation report and understood that the valuation was as of August 31, 2001. The corporate attorney explained the terms of the stock-purchase agreement and mutual release to Lewis, and Lewis signed it.

{¶ 5} Thereafter, Lewis filed a complaint against Mathes, Mathes's wife, Stehley, the corporate attorney, and the Corporation. In his complaint, Lewis alleged that (1) the Matheses, Stehley, and the corporate attorney had falsely and fraudulently represented the value of the Corporation by failing to disclose approximately $200,000 in additional net profit earned by the Corporation in 2001, (2) the Matheses and Stehley withheld the Corporation's financial information from him, obtained pecuniary benefits from the Corporation that were not made available to him, and breached their fiduciary duty to him causing him pecuniary injury, (3) the Corporation, Mathes, and Stehley converted various items of his personal property, and (4) the corporate attorney committed legal malpractice by stating that Lewis did not need legal representation and had no choice but to agree to the terms of the stock-purchase agreement and mutual release.

{¶ 6} The Matheses, Stehley, and the Corporation moved the court for summary judgment on the ground that Lewis was seeking to avoid the mutual release by alleging that they had obtained the release by fraud in the inducement but that Lewis had failed to pay back the consideration he had received for executing the release, as required by *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 552 N.E.2d 207, citing *Manhattan Life Ins. v. Burke* (1903), 69 Ohio St. 294, 70 N.E. 74.

{¶ 7} In his memorandum contra, Lewis argued that he was not required to return the $68,000 to maintain his causes of action, because (1) the monetary consideration he received was solely for the purchase of his stock at the value determined by the corporate valuation, (2) he received no monetary consideration

in exchange for the mutual release, and (3) the balance of the equities does not favor his returning the money. Additionally, Lewis argued that he did not seek to avoid the release altogether but to reform it due to a mutual mistake.

{¶ 8} On March 8, 2004, the trial court entered judgment granting the motion of the Matheses, Stehley, and the Corporation for summary judgment.[3] The trial court found that Lewis had not returned any of the money that he had received as consideration for the release as required to maintain an action for fraud in the inducement. Additionally, the trial court found that Lewis had failed to introduce any sworn statements, tax returns, or other evidence demonstrating when the Corporation had allegedly earned the additional $200,000 that Lewis claims it had and that Lewis failed to present any evidence showing who had knowledge of the additional income and when those persons obtained such knowledge.

{¶ 9} Lewis appeals, raising the following assignment of error: "The trial court erred as a matter of law in determining that a party must tender the money received for payment of stock under a stock-purchase agreement and mutual release in order to maintain a subsequent suit based on fraud, breach of fiduciary duty, and conversion."

II

{¶ 10} In his sole assignment of error, Lewis argues that the trial court erred as a matter of law when it determined that he must return the money he had received as consideration for the purchase of his stock in the Corporation under the stock-purchase agreement and mutual release in order to avoid the release and maintain his lawsuit.

{¶ 11} Summary judgment is appropriate when the court finds that (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. Civ.R. 56. See *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46; *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 411, 599 N.E.2d 786. "In reviewing the propriety of summary judgment, an appellate court independently reviews the record to determine if summary judgment is appropriate. Accordingly, we afford no deference to the trial court's decision in answering that legal

---

3. The corporate attorney separately moved the trial court for summary judgment on Lewis's legal-malpractice claim, and the trial court granted that motion by a separate entry. No one appealed the summary judgment in favor of the corporate attorney.

question." *Morehead* at 411–412, 599 N.E.2d 786. See, also, *Schwartz v. Bank One, Portsmouth, N.A.* (1992), 84 Ohio App.3d 806, 809, 619 N.E.2d 10.

{¶ 12} The burden of showing that no genuine issue of material fact exists falls upon the party requesting summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 662 N.E.2d 264, citing *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798. The moving party bears this burden even for issues for which the nonmoving party may bear the burden of proof at trial. Id. "However-er, once the movant has supported his motion with appropriate evidentiary materials, the nonmoving party may not rely upon the allegations and/or denials in his pleadings. * * * He must present evidentiary materials showing that a material issue of fact does exist." *Morehead* at 413, 599 N.E.2d 786. Civ.R. 56(C) specifically provides that a trial court shall consider only "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact."

{¶ 13} In their motion for summary judgment, the Matheses, Stehley, and the Corporation argued that the release, executed by Lewis, acts as an absolute bar to his causes of action. They argued that because Lewis's complaint alleged fraud in the inducement, rather than fraud in factum, he could avoid that bar only by repaying the $68,000 that they claim he received as consideration for his release.

{¶ 14} A release is a contract that is favored by the law to encourage the private resolution of disputes. *Lynch v. Malrite Communications* (July 31, 1997), Cuyahoga App. No. 71144, 1997 WL 428644, citing *Garrison v. Daytonian Hotel* (1995), 105 Ohio App.3d 322, 325, 663 N.E.2d 1316, and *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.* (1996), 74 Ohio St.3d 501, 502, 660 N.E.2d 431. A release of a cause of action ordinarily acts as an absolute bar to any later action on any claim encompassed within the release. *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 13, 552 N.E.2d 207, citing *Perry v. M. O'Neil & Co.* (1908), 78 Ohio St. 200, 85 N.E. 41. A releasor may avoid that bar by alleging that the release was obtained by fraud. Id. Whether the releaser must pay back the consideration that he received for the release depends on whether the fraud alleged renders the release void or merely voidable. Id.

{¶ 15} A release obtained by fraud in factum is void ab initio. Id. Fraud in factum occurs when a device, trick, or want of capacity causes the releasor to fail to understand the nature and consequence of the release. Id., citing *Picklesimer v. Baltimore & Ohio RR. Co.* (1949), 151 Ohio St. 1, 5, 38 O.O. 477, 84 N.E.2d 214. In such cases, the release is void ab initio because there has been no meeting of the minds. Id. When the fraud alleged would render the release void, the releasor is not required to give back the consideration that he

8 ·

received for the release in order to avoid the bar and pursue a cause of action purportedly encompassed by the release.  Id.

{¶ 16} In contrast, fraud in the inducement encompasses those instances in which the releasor understands the nature of the release and intends to be bound by it at the time of execution.  *Haller*, 50 Ohio St.3d at 14, 552 N.E.2d 207.  Later, the releasor seeks to avoid the release on the ground that the party that benefited by the release had induced him to grant the release by wrongful conduct, misrepresentation, coercion, or duress.  Id.  When a release is obtained through fraud in the inducement, it is merely voidable.  Id.  Therefore, the releasor may contest it only after he returns the consideration that he received in exchange for the release.  Id.

{¶ 17} Here, Lewis seeks to avoid the release he executed on the ground that the Matheses, Stehley, and the Corporation misrepresented the Corporation's earnings and, therefore, misrepresented the value of his one-third interest in the Corporation.  Thus, Lewis alleges fraud in the inducement rather than fraud in factum.  However, Lewis argues that he should not be required to return the $68,000 that he received in order to maintain his causes of action because (1) the monetary consideration he received was solely for the purchase of his stock at the value determined by the corporate valuation, (2) he received no monetary consideration in exchange for the mutual release, and (3) the balance of the equities does not favor his returning the money.

{¶ 18} In order to determine whether Lewis must return the $68,000 that he received, we must examine the parties' agreement to determine whether he received that money as consideration for his release.  We interpret a contract to carry out the intent of the parties.  *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920; *Employers' Liab. Assur. Corp. v. Roehm* (1919), 99 Ohio St. 343, 124 N.E. 223, syllabus; *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of the syllabus.  "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus.  We read a contract as a whole and gather the intent of each party from a consideration of the whole.  *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519.

{¶ 19} Where a contract is clear and unambiguous, its interpretation is a matter of law, and summary judgment is appropriate.  *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271.  Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if

the terms are reasonably susceptible of more than one interpretation. *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.* (1998), 129 Ohio App.3d 45, 55, 716 N.E.2d 1201. When ambiguity exists, the interpretation of the parties' intent constitutes a question of fact. *Center Ridge Ganley, Inc. v. Stinn* (1987), 31 Ohio St.3d 310, 314, 31 OBR 587, 511 N.E.2d 106; *Amstutz v. Prudential Ins. Co.* (1940), 136 Ohio St. 404, 408, 16 O.O. 572, 26 N.E.2d 454.

{¶ 20} Here, Lewis contends that the $68,000 he received was only for the purchase of his stock at the price determined by the corporate valuation. Additionally, he asserts that the stock-purchase agreement and mutual release contemplates a *separate* payment of $68,000 as consideration for his release—a payment that he claims he never received. Specifically, Lewis claims that in reference to the stock purchase, the agreement provides for two separate payments of $34,000, payable on December 15, 2001, and January 2, 2002. In his affidavit, Lewis avers that he received one check for $34,000 at the December 15, 2001, meeting and a separate check for $34,000 sometime after January 4, 2002.

{¶ 21} Despite the recitation in the agreement acknowledging receipt of $68,000 in exchange for his release, Lewis avers that he never received monetary compensation for the mutual release. Because of the alleged ambiguity of the agreement regarding the consideration for his release, Lewis contends that the trial court erred in determining that the Matheses, Stehley, and the Corporation are entitled to judgment as a matter of law because he failed to return the $68,000 before pursuing his causes of action.

{¶ 22} The agreement clearly sets forth the consideration that Lewis was to receive in exchange for his shares of stock in paragraphs three and four, which provide:

WHEREAS in consideration of the payment of $68,000.00 by said Company to John Lewis, payable in two (2) cash payments December 15th, 2001 ($34,-000.00) and January 2, 2002 ($34,000.00); John Lewis has escrowed his 100 shares of common stock to John D. Morris, Company Attorney, to transfer upon sale and receipt of all proceeds ($68,000.00) said shares to the Company Treasury, and has by signing this Agreement and Release also resigned as Vice President of the Company effective this date.

WHEREAS said Company by its President[,] Timothy Stehley[,] and Secre-tary–Treasurer[,] Tom D. Mathes Jr.[,] have agreed to also pay John Lewis his regular compensation through December 31, 2001; and also agreed he shall be eligible for unemployment and COBRA health benefits after being laid off from the Company this date.

{¶ 23} The fifth paragraph of the agreement, pertaining to the mutual release, then provides:

NOW THEREFORE, in consideration of the above promises set out and made binding on John Lewis and S.M.L. Contractors Inc. by its officers and also for the sum of Sixty-eight Thousand Dollars ($68,000.00), the receipt and sufficiency of which are hereby acknowledged, I, John Lewis, the undersigned, on behalf of myself, heirs and assigns do hereby forever release, settle, and acknowledge to be fully satisfied, any and all claims, rights, and causes of action of every kind, nature, or description whatsoever, including employment termination rights; loss of wages; bonuses or other consideration, which I/we have or may hereafter assert against S.M.L. Contractors Inc., its officers and owners, although no such claims are known to exist * * *.

{¶ 24} After reviewing the stock-purchase agreement and mutual release, we conclude that the terms relating to the consideration given for Lewis's release are ambiguous. Specifically, we find that the language referring to "the sum of Sixty-eight Thousand Dollars ($68,000.00), the receipt and sufficiency of which are hereby acknowledged" conflicts with the prior language referring to two separate payments of $34,000 each, at least one of which was to occur 18 days after Lewis executed the document. Therefore, we cannot ascertain from the four corners of the document whether the parties contemplated that the $68,000 that Lewis received in two installments of $34,000 for the purchase of his stock was the same $68,000 that was to serve as consideration for his release.

{¶ 25} When contractual terms are ambiguous, a court may consider extrinsic evidence to ascertain the intent of the parties and the meaning of the contract's terms. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949. Ordinarily, summary judgment is inappropriate when contractual language is ambiguous, because a question of fact remains. *Norfolk & W. Ry. Co. v. A.B.C. Dock, Inc.* (April 30, 1987), Lawrence App. No. 1809, 1987 WL 10450. But if the extrinsic evidence demonstrates that no genuine issue of material fact exists, we conclude that summary judgment may still be appropriate.

{¶ 26} Here, the extrinsic evidence submitted by the parties leaves no doubt that all of the parties understood that Lewis would receive a total of $68,000 in exchange for both the corporation's purchase of his stock and the release. During Lewis's deposition, he was asked whether he was satisfied with the agreement and the $68,000 he received from the Corporation before his accountant informed him of possible undisclosed income. Lewis explicitly testified that he was told that $68,000 was all he was ever going to get. Although the agreement may have been inartfully drafted, the evidence clearly demonstrates that all of the parties, including Lewis, understood that Lewis would receive a total of $68,000 for the purchase of his stock and the release. Moreover, Lewis's

failure to include a cause of action for breach of contract demanding payment of an additional $68,000 reinforces this understanding of the agreement.

{¶ 27} We have determined that Lewis was entitled to a total of $68,000 in exchange for his stock and the release under the terms of the agreement. Now, we must decide whether Lewis was required to give back that consideration to maintain his suit against the Matheses, Stehley, and the Corporation under *Haller*, supra.

{¶ 28} Lewis argues that he should not have to give back the consideration that he received, because, regardless of the outcome of his lawsuit, he is entitled to the $68,000 for his stock, as established by the stock-valuation report. Therefore, Lewis argues, he should be able avoid the release and keep the $68,000 he received. In contrast, the Matheses, Stehley, and the Corporation argue that the $68,000 payment to Lewis was part of a total package of consideration given in exchange for both the stock and the release. They contend that, in the absence of the agreement, they were not obligated to buy Lewis's shares at any price. We agree with the Matheses, Stehley, and the Corporation.

{¶ 29} "A liquidated claim is one that can be determined with exactness from the agreement between the parties or by arithmetical process or by the application of definite rules of law." *Huo Chin Yin v. Amino Prods. Co.* (1943), 141 Ohio St. 21, 29, 25 O.O. 136, 46 N.E.2d 610. Here, the stock-valuation report states that, in the accountant's opinion, Lewis's shares had a fair market value of $68,000 as of August 31, 2001. However, the report does not create any obligation for Mathes, Stehley, or the Corporation to purchase Lewis's shares at that price.

{¶ 30} The only document creating any obligation on the part of Mathes, Stehley, and the Corporation to purchase Lewis's stock is the stock-purchase agreement and mutual release. Thus, if we are to find that Lewis has a liquidated claim to the $68,000 he has already received and that he is not required to return it to avoid the release, we must find that the stock purchase and release are severable.

{¶ 31} We have previously held that a "contract is generally not severable or divisible when its purpose, terms, and nature contemplate that its parts and consideration shall be interdependent and common to each other. * * * If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject thereof may consist of several distinct and wholly independent items." *DePugh v. Mead Corp.* (1992), 79 Ohio App.3d 503, 513, 607 N.E.2d 867.

{¶ 32} Here, both the stock-purchase and mutual-release portions of the agreement specifically refer to the entire $68,000 consideration. The parties did

not apportion part of the consideration for Lewis's stock and part for his release. Furthermore, we have already determined that all of the parties, including Lewis, understood that Lewis would receive a total of $68,000 under the terms of the agreement. Accordingly, the agreement was entire. Therefore, Lewis was required to return the $68,000 to avoid the release and pursue his causes of action against the Matheses, Stehley, and the Corporation.

{¶ 33} Based upon the foregoing, construing the evidence most strongly in Lewis's favor, we find that no genuine issue of material fact exists and that the Matheses, Stehley, and the Corporation are entitled to judgment as a matter of law. Accordingly, we overrule Lewis's sole assignment of error and affirm the trial court's judgment.

Judgment affirmed.

ABELE, P.J., and HARSHA, J., concur.