[Cite as *Nighswander v. Waterstone LSP, L.L.C.*, 2022-Ohio-971.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

David Nighswander

    Appellant

v.

Waterstone LSP, LLC, et al.

    Appellees

Court of Appeals No.  OT-21-006

Trial Court No.  20CV215

**<u>DECISION AND JUDGMENT</u>**

Decided:  March 25, 2022

* * * * *

Jeffrey M. Stopar and William T. Maloney, for appellant

Matthew S. Brown, for appellees.

* * * * *

**ZMUDA, J.**

## I.    Introduction

**{¶ 1}** Appellant, David Nighswander, appeals the judgment of the Ottawa County

Court of Common Pleas, denying his motion for partial summary judgment and granting

a motion for summary judgment filed by appellees, Waterstone LSP, LLC, Mark

Danford, and Anthony Parrino, thereby dismissing his complaint for breach of contract. For the following reasons, we reverse the judgment of the trial court, in part.

### A. Facts and Procedural Background

{¶ 2} This action originated upon appellant's filing of a complaint with the trial court on July 17, 2020. In his complaint, appellant asserted claims including breach of contract, conversion, and breach of fiduciary duties, arising out of appellees' refusal to pay him monies allegedly owed to him under a Purchase Agreement entered into by the parties on August 26, 2019.[1] The Purchase Agreement arose out of a previous dispute involving appellant, Danford, and Parrino, who were formerly business partners and co-owners of Waterstone. Due to the fact-intensive nature of this case and the fact that this appeal arises out of a decision granting summary judgment, we will provide a detailed summary of the facts contained in the record.

{¶ 3} Waterstone, a Texas-based limited liability company formed in 2012 by appellant, Danford, and Parrino, is a "Lender Service Provider" with the United States Small Business Association ("SBA"). According to an affidavit filed by appellant in this case, Waterstone is in the business of providing loan consulting services to SBA lenders for a fee that is "generally based on a scheduled percentage of the loan amount, and is earned with respect to any given loan, when the loan is closed."

---

[1] In its decision granting summary judgment and dismissing appellant's complaint, the trial court examines the breach of contract claim, but provides no analysis of the remaining claims.

2.

**{¶ 4}** After operating the business for seven years, a dispute arose between the parties that led to a breakdown in their business relationship. A lawsuit ensued, prompting a settlement agreement under which Danford and Parrino agreed to redeem appellant's ownership interest in Waterstone. To effectuate the redemption, the parties entered into a Purchase Agreement on August 26, 2019. Under the agreement, appellees agreed to purchase appellant's 33 percent ownership interest and appellant agreed not to compete with Waterstone within the "Restricted Area" (defined to include the States of Texas, Ohio, and Michigan) for a four-year period ending on December 31, 2023.

**{¶ 5}** In exchange for the covenant not to compete, appellees agreed to make periodic payments to appellant. The provision detailing the periodic payments is set forth, in relevant part, in the Purchase Agreement as follows:

> B.     Seller's Non-Competition Covenant. As consideration for Seller's Non-Competition Covenant, the Company shall make periodic payments to Seller (the "Periodic Payments") based on the Company's Closed Loan Volume, in accordance with the following provisions:
>
> i. <u>Closed Loan Volume.</u> "Closed Loan Volume," as used herein, means the total of all loans closed by the Company during the four-calendar-year period commencing on January 1, 2020, and ending on December 31, 2023 (the "Computation Period"). For purposes of construing the foregoing definition, a loan will be considered "closed" when the Company becomes entitled to receive some compensation for the

3.

loan (regardless of when the Company issues invoices or receives payment for such loans) and shall be determined in good faith and in a manner consistent with the past practices of the Company as reported to Seller.

II. <u>Monthly Payments for 4 Calendar Years.</u> The Company will pay to Seller, in periodic installments, a sum equal to three-tenths of one percent (0.30%) of Closed Loan Volume during the Computation Period. Periodic payments coming due under this provision shall be computed and paid as follows: within 15 days after the end of each calendar month during the Computation Period, the Company will compute and send to Seller a payment equal to three-tenths of one percent (0.30%) of Closed Loan Volume for that month. The last payment for each calendar year in the Computation Period shall be made within 15 days after the end of such calendar year.

{¶ 6} Seven months after the parties executed the Purchase Agreement, in March 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), 116 U.S.C. 9001 et seq, went into law. The CARES Act includes a loan lending program administered by the SBA known as the Paycheck Protection Program ("PPP program").

{¶ 7} Since March of 2020, Waterstone has been able to take advantage of business opportunities brought about by the PPP program and the loan demand it created by acting as a servicing agent for PPP loans. In total, Waterstone provided services on PPP loans totaling over $391 million. This business generated approximately $2,600,000

4.

in revenue for Waterstone. Appellant asserted that he was entitled to a share of this additional income as part of his periodic payments under the Purchase Agreement. Appellees disagreed and refused to include the PPP program loan revenue when calculating appellant's periodic payments.

{¶ 8} Thereafter, on July 17, 2020, appellant filed his complaint against Waterstone. On October 5, 2020, Waterstone filed its answer, in which it denied appellant's allegation that it breached the Purchase Agreement or any fiduciary duties.[2] Additionally, Waterstone filed a counterclaim, and Danford and Parrino joined together in filing a "third-party complaint,"[3] in which appellees sought a declaration from the trial court that "'Closed Loan Volume' as defined in the Purchase Agreement does not include compensation received by Waterstone, as an agent, for the limited services provided in connection with the PPP loans and therefore the income generated from PPP loans shall not be included in the 'Closed Loan Volume' calculation under the Purchase Agreement."

---

[2] During the three-month period between appellant's filing of his complaint and Waterstone's filing of an answer, Waterstone filed a motion to dismiss or, in the alternative, to stay the proceedings. Waterstone's motion was premised upon the pendency of another action that involved the same parties and issues, *Waterstone LSP, LLC v. Nighswander*, Harris County District Court No. 2020-36699, which was brought by appellees against appellant in Texas. The motion was ultimately denied by the trial court on September 23, 2020, after the Texas suit was dismissed for want of jurisdiction.
[3] Danford and Parrino were not parties to this action until they joined by filing their "third party complaint." Appellant did not challenge Danford and Parrino's use of a third party complaint to join themselves to this action in the trial court, and he does not raise the issue in this appeal.

5.

{¶ 9} According to the counterclaim and third party complaint, Waterstone has, since its founding, generated revenue in two ways – by (1) servicing loans and by (2) closing loans, thereby earning an "Extraordinary Servicing Fee." This distinction is allegedly reflected in Waterstone's past practices and financial statements. Appellees asserted that closing SBA loans and generating Extraordinary Servicing Fees takes Waterstone four months and involves more work than merely servicing loans. Moreover, appellees maintained that the fees generated by servicing loans are "separate and apart from loan closing fees."

{¶ 10} Under their interpretation of the relevant provisions of the Purchase Agreement, appellees stated that the periodic payments for "Closed Loan Volume" to which appellant is entitled under the Purchase Agreement are based upon fees generated by Waterstone in connection with its loan *closing* services, not its loan *processing* services. Because Waterstone does not close PPP loans, but merely services them in a limited fashion as an agent, appellees reasoned that fees generated by Waterstone in connection with those loans are excluded from the calculation of appellant's periodic payment under the Purchase Agreement.

{¶ 11} On October 28, 2020, appellant responded to the third party complaint and counterclaim, denying appellees' allegations and maintaining his entitlement to a share in the fees generated by Waterstone's involvement in the PPP program.

{¶ 12} Two weeks later, on November 13, 2020, appellant filed a motion for partial summary judgment as to the breach of contract claims contained in his complaint.

6.

In his memorandum in support of the motion, appellant articulated that the "central issue in the case is whether so-called 'PPP' loans are included within the meaning of 'all loans' as that term is used in the Purchase Agreement that is the subject of this case." Appellant argued that the phrase "all loans" was unambiguous and deliberately comprehensive. As such, appellant contended that the phrase included PPP loans. Therefore, appellant sought summary judgment as to appellees' breach of the Purchase Agreement, but acknowledged that such judgment could only be partial at that juncture, since "[t]he amount of [his] damages cannot be determined yet, as [appellees] have withheld the information on PPP Loan Volume and objected to discovery requests seeking its production."

{¶ 13} In support of his motion for partial summary judgment, appellant submitted an affidavit to the trial court, in which he averred the following concerning Waterstone's business model and his communications with Danford and Parrino about the PPP program:

3. Waterstone is in the business of providing loan consulting services to lenders and is a "Lender Service Provider" with the US Small Business Administration ("SBA"). As such, Waterstone generates a substantial portion of its income by providing services to lenders with respect to SBA loans. Waterstone's compensation for such services is generally based on a scheduled percentage of the loan amount, and is earned with respect to any given loan, when the loan is closed.

7.

Waterstone's employees include a designated "Closing Officer" who (with other Waterstone employees) works with lenders to facilitate the process of closing loans, but Waterstone does not itself act as the closing agent on SBA loans.

* * *

7. As a Lender Service Provider, with special expertise in SBA loans, Waterstone was ideally situated to take advantage of the Paycheck Protection Loan Program ("the PPP Loan Program") when it was added to the SBA's 7(a) loan program in March of 2020 and has experienced a significant increase in Closed Loan Volume, as defined in the Purchase Agreement, since the implementation of the PPP Loan Program.

8. During the period from March of 2020 to June 18, 2020, I had numerous telephone and email communications with Parrino and Danford concerning the PPP Loan Program. In these communications, Parrino and Danford acknowledged that I was entitled under the Settlement Agreement and Purchase Agreement to receive the specified percentage of Waterstone's loan volume for PPP Loans. Both Parrino and Danford asked me to consider a voluntary reduction in the amount due to me for my share of PPP Closing fees, on the ground that the amount paid to Waterstone for its work on PPP loans would be less than what Waterstone was accustomed to receiving.

8.

9. On April 30, 2020 and June 3, 2020, Parrino sent me by email a summary of Waterstone's closed PPP Loans through April and May of 2020. From the information provided, it was apparent that the PPP Loans closed by Waterstone were extremely profitable for the company. The loan volume for closed PPP loans was in excess of $391 million. Waterstone's compensation based on that loan volume would exceed $2.6 million. Significantly, the largest single bank customer for the PPP loans shown in the summary was an Ohio bank with closed loan volume of more than $130 million.

10. On June 18, 2020, Waterstone filed a lawsuit against me in a Texas state court. I had no notice that Waterstone disputed my rights under the Purchase Agreement prior to learning that Waterstone had filed its Petition in the Texas state court. * * * The Texas case has since been dismissed for want of jurisdiction.

11. At no time prior to the commencement of the Texas litigation was there any suggestion from Parrino, Danford, or anyone else from Waterstone that PPP Loans were not included in the definition of "all loans" under the Purchase Agreement. To the contrary, Parrino and Danford both acknowledged that I was entitled under the Agreements to receive the specified percentage of Waterstone's PPP loan volume (Danford

9.

referred to them as PPP Closing fees") and asked me to take a voluntary reduction in the amount to which I am entitled.

12. Since the filing of the Texas lawsuit, Waterstone has refused to provide information on PPP loan Closing (sic) to me and has failed to pay me the specified percentage (or any percentage) of loans closed under the Paycheck Protection Program. It has excluded PPP loans from the computation of "Closed Loan Volume" that it is required to send me each month and has refused to send me the financial statements that it is required to provide me under the Purchase Agreement.

{¶ 14} On December 9, 2020, appellees filed their response to appellant's motion for partial summary judgment, and also moved the trial court for summary judgment in their favor on their declaratory judgment action. Like appellant, appellees acknowledged that this case "turns on the interpretation of an unambiguous contract." However, appellees differed with appellant's expansive interpretation of the phrase "all loans" in the Purchase Agreement.

{¶ 15} According to appellees, appellant's interpretation "entirely eliminates the word 'closing' and the requirement that the loan must be *closed* by Waterstone to earn a closing fee." Appellees asserted that appellant has always received "Closed Loan Pipeline reports," which Waterstone has generated since its inception, and argued that the fees stated therein are those in which appellant is entitled to share under the Purchase Agreement. Appellees went on to contend that the Closed Loan Pipeline reports were

10.

routinely generated as part of Waterstone's past practices, they were "not new," and they were "clearly known to [appellant] prior to execution of the Purchase Agreement." Appellees questioned the consistency of appellant's argument in light of the fact that appellant had not made a similar demand to share in Waterstone's non-closing income, including "servicing fee income, construction fee income, processing fee income, or any other form of income, other than closed loan income."

{¶ 16} Based upon their contention that the Purchase Agreement only references fees generated by Waterstone in connection with loans it closes, appellees urged the trial court to determine that non-closing income such as that generated in connection with the PPP program is not within the purview of the Purchase Agreement and thus appellant is not entitled to a share of it as a matter of law.

{¶ 17} To support their motion for summary judgment, appellees attached an affidavit from Danford, who averred that Waterstone, since 2017, has generated the majority of its revenue from servicing loans rather than closing loans. Referencing Waterstone's yearly profit/loss statements (which were included with the affidavit), Danford explained that Waterstone has always recognized "separate and distinct categories of income, including (1) Consulting Fee Income; (2) Extraordinary Servicing Fee; (3) NSF Fee Income; (4) Other Income; (5) Processing Fee Income; and (6) Servicing Fee Income." According to Danford, closing fees are reflected under the Extraordinary Servicing Fee line item on Waterstone's profit/loss statement.

11.

**{¶ 18}** Danford provided additional detail regarding Waterstone's Closed Loan Pipeline reports, explaining that "[o]nly the loan closing fees or loans closed by Waterstone are [included] in the Closed Loan Volume, which is how such has been delineated since 2012. Processing fees have always been separate and apart from loan closing fees." Copies of Waterstone's Closed Loan Pipeline reports from 2012 through 2020 were attached to Danford's affidavit. Those reports contain a listing of certain loans, but no explanation is given therein as to what work Waterstone performed in connection with those loans. Further, the documentation provided by Danford did not set forth the basis upon which loans were historically placed onto the Closed Loan Pipeline reports by Waterstone.

**{¶ 19}** According to Danford, appellant received an email each month beginning in January 2020 that included the Closed Loan Pipeline report and a calculation of the periodic payment based upon that report. Danford included with his affidavit a copy of an email exchange that took place between himself and appellant in January and February 2020 as an example of the correspondence that took place on a monthly basis regarding appellant's periodic payment under the Purchase Agreement. In the exchange, Danford provided appellant with a copy of Waterstone's Closed Loan Pipeline report and a calculation of the periodic payment based upon the number reflected therein, to which appellant assented. Danford explained that appellant agreed to periodic payments equal to 0.30 percent of the gross amount of the loans closed by Waterstone from January

12.

through May 2020, and attached payment confirmations for those months to support his assertion.

{¶ 20} Regarding Waterstone's PPP program business, Danford stated that Waterstone merely acts as an agent and does not close PPP loans. Indeed, Danford stated that an Interim Final Rule promulgated by the SBA, which Danford attached to his affidavit, only allows Waterstone to provide "limited services" in connection with PPP loans, which Danford described as processing services that included "(1) establishing a secure portal for lender/small business to submit application packages, (2) reviewing application packages for completeness and returning to lender if incomplete, (3) assisting lender in analysis of eligible loan amount and estimated forgiveness, if required by the lender, and (4) obtaining SBA authorization."

{¶ 21} Danford asserted that Waterstone's provision of these services generated significantly less revenue per loan than that which is generated by Waterstone in connection with non-PPP loans handled by the company. Danford stated that Waterstone "did not and does not close the PPP loans and will not be paid loan closing fees on the PPP loans in a manner consistent with past practices. The lender (i.e. bank) unilaterally prepared its own loan documents, coordinated with its loan customer and closed the PPP loans."

{¶ 22} On December 22, 2020, appellant filed his memorandum in opposition to appellees' motion for summary judgment, again asserting that the phrase "all loans" in

13.

the Purchase Agreement was intentionally broad enough to include income such as that generated by Waterstone's processing of PPP loans.

{¶ 23} Appellant filed a supplemental affidavit along with his reply, in which he acknowledged that Waterstone tracks its SBA loan prospects from inception to closing in a "Pipeline" report, and moves each prospect to the Closed Loan Pipeline report when the loan closes, which appellant defined as the point at which loan documents are executed and the loan is funded. According to appellant, the classification of loans as closed by Waterstone "has nothing to do with who may have conducted the actual signing of loan documents." As he did in his first affidavit, appellant indicated that he had prior discussions with Danford and Parrino during which they allegedly acknowledged that he was entitled to receive compensation under the Purchase Agreement for Waterstone's PPP program revenue. Notably, appellant did not attach correspondence evidencing these discussions to either affidavit he filed with the trial court.

{¶ 24} On January 15, 2021, appellees filed their reply in support of their motion for summary judgment. Appellees reiterated the arguments raised in their motion for summary judgment and argued that appellant's supplemental affidavit contained several factual inaccuracies.

{¶ 25} Appellees submitted several additional affidavits with their reply, including nearly identical affidavits from Danford and Parrino in which they summarized Waterstone's role in servicing PPP loans and stated that Waterstone "did not close the PPP loans and therefore did not generate PPP closed loan reports." Danford and Parrino

14.

further asserted that Waterstone received a processing fee, not a closing fee, for the PPP loans it handled.

{¶ 26} The averments contained in the affidavits filed by Danford and Parrino were corroborated by six additional affidavits from executives who were employed at financial institutions engaged in the issuance of PPP loans for which Waterstone provided services. According to each of these individuals, Waterstone provided limited services in connection with PPP loans, and those services did not include "the drafting of loan documents, coordinating the closing with the Borrower, reviewing the executed loan documents or the funding of the loans." Of course, these individuals were merely customers of Waterstone, and thus could not (and did not) pass upon the salient issue of whether the services provided by Waterstone on PPP loans were sufficient to require Waterstone to place such loans onto its Closed Loan Pipeline report upon closing of such loans.

{¶ 27} On February 11, 2021, the trial court issued its decision on the parties' competing motions for summary judgment. In its decision, the trial court found that the Purchase Agreement is "clear and unambiguous." Citing the affidavits filed by appellees, the court determined that Waterstone "does not provide services on PPP loans which would be within the definition of 'closed loan volume.' Rather, Waterstone provides processing services for these loans." Although the matter was before the trial court on summary judgment, the court did not address the competing affidavits filed by appellant, which expressly reject the distinction between closing services and processing services

15.

contained in appellees' affidavits. Instead, the trial court relied upon the affidavits filed by appellees and found that appellant is not entitled to payment of any portion of the fees generated by Waterstone in connection with PPP loans as a matter of law. Thus, the trial court granted appellees' motion for summary judgment, denied appellant's motion for partial summary judgment, and dismissed appellant's complaint.

{¶ 28} Appellant's timely notice of appeal followed.

## B.     Assignments of Error

{¶ 29} On appeal, appellant assigns the following errors for our review:

Assignment of Error No. 1: The Lower Court Erred in Failing to Grant Summary Judgment for the Appellant.

Assignment of Error No. 2: The Lower Court Erred in Granting Summary Judgment for the Appellees.

{¶ 30} Appellant's assignments of error are interrelated, and will therefore address them together.

## II.     Analysis

{¶ 31} In appellant's assignments of error, he argues that the trial court erroneously resolved the parties' competing motions for summary judgment in favor of appellees.

## A.    Standard of Review

{¶ 32} We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 33} On a motion for summary judgment, the moving party has the burden of demonstrating that no genuine issue of material fact exists. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). In doing so, the moving party must point to some evidence in the record in the form of "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action[.]" Civ.R. 56(C); *Dresher* at 292-293. The burden then shifts to the nonmoving party to provide evidence showing that a genuine issue of material fact does exist. *Dresher* at 293. The failure to satisfy this reciprocal burden warrants judgment against the nonmoving party. *Id.*

17.

## B. Parties' Arguments

{¶ 34} The dispute in this case revolves around the deceptively simple issue of whether PPP loans qualify as part of Waterstone's Closed Loan Volume calculation. As such, the issue centers on the interpretation of the Purchase Agreement's periodic payment provision. In particular, the parties dispute whether PPP loan should be included in the calculation of "Closed Loan Volume," upon which the periodic payments are based. This term is defined within the agreement as follows:

> i. <u>Closed Loan Volume.</u> "Closed Loan Volume," as used herein, means the total of all loans closed by the Company during the four-calendar-year period commencing on January 1, 2020, and ending on December 31, 2023 (the "Computation Period"). For purposes of construing the foregoing definition, a loan will be considered "closed" when the Company becomes entitled to receive some compensation for the loan (regardless of when the Company issues invoices or receives payment for such loans) and shall be determined in good faith and in a manner consistent with the past practices of the Company as reported to Seller.

{¶ 35} For his part, appellant argues that Closed Loan Volume should be understood broadly to include any compensation Waterstone received for work performed on any loans, including PPP loans, regardless of whether such work included closing the loan. Therefore, appellant argues that the trial court should have determined

18.

that he is entitled to share in the proceeds generated in connection with the PPP loans as a matter of law and erred in denying him summary judgment to that effect.

{¶ 36} By contrast, appellees emphasize that the definition of Closed Loan Volume includes "the total of all loans *closed*," and they argue that only the compensation Waterstone received for loans it actually closed should be included in Closed Loan Volume. Based upon their assertion that Waterstone serviced, but did not close, PPP loans, appellees reason that the income generated in connection with PPP loans does not fall within the definition of Closed Loan Volume and is therefore beyond the scope of the Purchase Agreement. Consequently, appellees argue that the trial court properly determined that appellant is not entitled to a share of the revenue generated by Waterstone in connection with PPP loans and appropriately granted summary judgment in their favor.

## C.    Relevant Contract Law

{¶ 37} "When we face an issue of contractual interpretation, our role 'is to give effect to the intent of the parties to the agreement.'" *Ohio Northern Univ. v. Charles Constr. Services, Inc.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, ¶ 11, quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987), paragraph one of the syllabus. "We interpret undefined terms in a contract according to their plain, ordinary meaning unless doing so would create an

19.

absurd result." *Columbus Steel Castings, Inc. v. Real Time Staffing Servs., Inc.*, 10th Dist. Franklin No. 10AP-1127, 2011-Ohio-3708, ¶ 18, citing *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Commrs.*, 152 Ohio App.3d 95, 2003-Ohio-1227, 786 N.E.3d 921, ¶ 40 (7th Dist.); *Alexander v. Buckeye Pipe Line*, 53 Ohio St.2d 241, 245-46, 374 N.E.2d 146 (1978).

{¶ 38} Where a contract is clear and unambiguous, its interpretation is a matter of law, and summary judgment is appropriate. *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322, 474 N.E.2d 271 (1984). However, when the disputed terms of the contract are ambiguous, the interpretation of the parties' intent generally constitutes a question of fact precluding summary judgment. *Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 314, 511 N.E.2d 106 (1987). A contract provision is ambiguous when it is susceptible to more than one reasonable interpretation. *Valentine* at ¶ 47, citing *Alexander Local School Dist. Bd. of Education* at ¶ 37. In such cases, the ambiguity must usually be resolved by the factfinder. *See Lewis v. Mathes*, 161 Ohio App.3d 1, 2005-Ohio-1975, 829 N.E.2d 318, ¶ 25 (4th Dist.), citing *Norfolk & W. Ry. Co. v. A.B.C. Dock, Inc.*, 4th Dist. Lawrence No. 1809, 1987 WL 10450 (April 30, 1987) ("Ordinarily, summary judgment is inappropriate when contractual language is ambiguous, because a question of fact remains.").

{¶ 39} Ambiguity in a contract is not always a bar to summary judgment, however. When a term in a contract is found to be ambiguous, a court may consider extrinsic evidence to ascertain the intent of the parties and the meaning of the term, and

20.

"if the extrinsic evidence demonstrates that no genuine issue of material fact exists, * * * summary judgment may still be appropriate." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996); *see also Valentine v. Cedar Fair, L.P.*, 2021-Ohio-2144, 174 N.E.3d 900, ¶ 41 (6th Dist.), citing *Alexander Local School Dist. Bd. of Education v. Village of Albany*, 2017-Ohio-8704, 101 N.E.3d 21, ¶ 37 (4th Dist.) ("When a contract is ambiguous or unclear, or when circumstances surrounding the agreement give the plain language special meaning, extrinsic evidence is admissible to ascertain the intent of the parties.").

### D.     The Purchase Agreement is Ambiguous

{¶ 40} The parties to this appeal assert that the terms of the Purchase Agreement are clear and unambiguous.  Despite their assertions of clarity, however, the parties present mutually exclusive interpretations as to the application of the term "Closed Loan Volume" and what categories of revenue generated by Waterstone in the course of its business fall within the umbrella of Closed Loan Volume.  Notably, the agreement is silent as to what work by Waterstone falls within and what work falls outside the umbrella of Closed Loan Volume.  With that in mind, we draw our attention to the express language of the Purchase Agreement, in which Closed Loan Volume is defined as "the total of all loans closed by the Company" during the Computation Period.  The operative word here is the word "closed."

{¶ 41} According to Black's Law Dictionary, the verb "close" means "to conclude; to bring to an end" or "to conclude discussion or negotiation about." *Black's*

*Law Dictionary* 290 (9th Ed.2009).  Relatedly, Black's Law Dictionary defines the term "closing" as the "final meeting between the parties to a transaction, at which the transaction is consummated; esp., in real estate, the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred."  *Id.* at 291.

{¶ 42} Applying the foregoing dictionary definitions to the phrase "all loans closed by the Company" in the Purchase Agreement would limit the loans for which appellant is entitled to compensation to only those loans actually brought to consummation by Waterstone.  However, even appellees acknowledge that Waterstone rarely acts as closing agent on loans and thus usually does not close loans in this ordinary sense.  Thus, the ordinary definition of the term "closed" found in the dictionary is obviously not what the parties had in mind when they executed the Purchase Agreement.

{¶ 43} In place of the dictionary definition, appellees insist that "closed" loans were limited to those loans in which Waterstone provided closing services, as opposed to mere processing services.  Appellees, referencing the affidavits they submitted to the trial court in conjunction with the their motion for summary judgment, contend that closing a loan involves eight tasks that must be completed by Waterstone, only some of which are completed by Waterstone on PPP loans.  Because all eight tasks are not completed by Waterstone, appellees reason that PPP loans are not loans closed by Waterstone and thus fall outside the definition of Closed Loan Volume.

22.

{¶ 44} On the other hand, appellant rejects appellees' distinction between closing services and processing services, and argues that Waterstone's level of participation with PPP loans was similar to its participation with all other loans for which he was paid.

{¶ 45} It is significant that the foregoing interpretations of the Purchase Agreement offered by the parties either depend upon matters outside the agreement itself to determine what it means to close a loan or misapply the language of the Purchase Agreement. In appellees' case, a distinction is made between closing services and processing services. These terms, and the distinction between them, are not in the Purchase Agreement. Rather, they are contained in appellees' affidavits. Moreover, appellees offer no supporting documentation to establish that Waterstone has historically categorized some loans as processing loans and other loans as closed loans.

{¶ 46} For his part, appellant advances an overly broad definition of "closed," which, if applied, would encompass all loans for which Waterstone receives any compensation. Appellant's argument relies upon the mistaken notion that the term "closed" is actually defined under the Purchase Agreement by the following sentence:

> For purposes of construing [Closed Loan Volume], a loan will be considered "closed" when the Company becomes entitled to receive some compensation for the loan (regardless of when the Company issues invoices or receives payment for such loans) and shall be determined in good faith and in a manner consistent with the past practices of the Company as reported to Seller.

23.

However, as pointed out by appellees, the foregoing sentence does not set forth a comprehensive definition of the term "closed" – it merely establishes the temporal element of that term, namely *when* the loan will be deemed closed.

{¶ 47} In sum, the parties present mutually exclusive interpretations of the term Closed Loan Volume. The record clearly shows that the parties intended something other than the dictionary definition of the term "closed" when they drafted the Purchase Agreement. However, they left unspecified the precise parameters of what constitutes a closed loan under Waterstone's particular business model.

{¶ 48} Both in the trial court and on appeal, the parties vehemently disagree as to the extent of Waterstone's involvement in the PPP loan closing process. In appellant's first affidavit, which he attached to his motion for partial summary judgment, appellant described Waterstone's business structure and asserted that Waterstone employs designated "Closing Officers" and "works with lenders to facilitate the process of closing loans, but Waterstone does not itself act as the closing agent on SBA loans."

{¶ 49} Appellant went on to insist that the services provided by Waterstone in connection with PPP loans created a "significant increase in Closed Loan Volume." Further, appellant stated that he had several telephone discussions with Danford and Parrino from March 2020 through June 2020. During those discussions, Danford and Parrino allegedly "acknowledged that [appellant] was entitled under the [Purchase Agreement] to receive the specified percentage of Waterstone's PPP loan volume (Danford referred to them as 'PPP Closing fees') and asked [him] to take a voluntary

24.

reduction in the amount to which [he was] entitled." Appellant stated that Danford and Parrino asked him to consider a voluntary reduction in his share of Waterstone's income on PPP loans given the reduced rate the company received for such work. Relatedly, appellant asserted that Parrino sent him an email with PPP loan information on April 30, 2020, and June 3, 2020. Appellant's averments, if believed, suggest an awareness on the part of Danford and Parrino that the work performed by Waterstone in connection with PPP loans was sufficient to warrant placing those loans on the Closed Loan Pipeline.

{¶ 50} In response to appellant's affidavit, appellees submitted an affidavit from Danford. In his affidavit, Danford asserted that the services provided by Waterstone fall into two separate categories, loan processing services and loan closing services. Danford insisted, contrary to appellant's affidavit, that Waterstone does close loans. Specifically, Danford stated: "Since its inception, Waterstone generates roughly half of its revenue from closing SBA loans. Since 2017, Waterstone generates most of its revenue from servicing loans rather than closing loans. * * * Closing fees are referred to as 'Extraordinary Service Fee' on Waterstone's Profit and Loss statements and invoices."

{¶ 51} Distinguishing between revenue Waterstone received for loan processing services and loan closing services, Danford went on to explain the tasks that Waterstone performs for lenders on loans for which Waterstone is paid an Extraordinary Service Fee, and indicated that it takes an average of four months to close a loan. Specifically, Danford stated:

25.

To close a loan and receive a closing fee, Waterstone performs these tasks for a lender: (a) establishes a secure portal for the lender/small business concern to submit application and supporting documents; (b) packages the supporting documents working directly with the lender's application; (c) underwrites the loan request to determine the eligible loan proceeds and credit worthiness; (d) sends approval recommendation to the lender; (e) coordinates the collection and review of due diligence documentation; (f) obtains SBA Authorization for the requested loan amount; (g) engages lender's legal counsel in the drafting of closing documents and coordinates closing with the customer; and (h) submits closed documents to the lender with closing instructions and coordinates funding of the loan either by single disbursement or multiple disbursements over time.

**{¶ 52}** Additionally, Danford asserted that Waterstone "only receives a closing fee after it submits the executed closing documents or reviews and confirms executed closing documents by a third-party closing agent (i.e. title company or mobile notary) to the lender with closing instructions and coordinates funding of the loan * * * ." Notably, Danford did not attach any internal business documents from Waterstone evidencing a written policy of limiting the characterization of a loan as "closed" to only those loans for which Waterstone completed the eight tasks identified above.

26.

{¶ 53} According to Danford, the services Waterstone provided as an agent in connection with PPP loans were more limited than those listed above. These services, which Danford described as processing services, included "(1) establishing a secure portal for lender/small business to submit application packages, (2) reviewing application packages for completeness and returning to lender if incomplete, (3) assisting lender in analysis of eligible loan amount and estimated forgiveness, if required by the lender, and (4) obtaining SBA authorization." Danford asserted that Waterstone's provision of these services generated significantly less revenue per loan than that which is generated by Waterstone in connection with non-PPP loans handled by the company. Danford stated that Waterstone "did not and does not close the PPP loans and will not be paid loan closing fees on the PPP loans in a manner consistent with past practices."

{¶ 54} Danford then referenced Waterstone's "Closed Loan Pipeline" reports, which Waterstone historically used to calculate Closed Loan Volume and appellant's periodic payment. According to Danford, such reports have been created by the company since 2012, and "[o]nly the loan closing fees or loans closed by Waterstone are [included] in the Closed Loan Volume, which is how such has been delineated since 2012." Waterstone's historical Closed Loan Pipeline reports were attached to Danford's affidavit. The reports include several loans and information pertinent to those loans, but they do not include an explanation as to how loans are placed onto the report or the criteria used by Waterstone in making that determination.

27.

{¶ 55} Moreover, several reports styled simply as "Pipeline" reports were also attached. These reports reflect the loans that remain active, as opposed to closed, during the reporting period reflected on the report. It is unclear from the record whether the active pipeline report reflects all of the loans for which Waterstone provides services, closing or otherwise, or if it includes only those loans that will eventually be closed by Waterstone. Again, no explanation is provided. Nonetheless, it is clear from the record that appellant's periodic payment was calculated based off of the Closed Loan Pipeline report, not the active pipeline report, as evidenced by an email correspondence attached to Danford's affidavit wherein appellant acknowledged the validity of a periodic payment that was calculated using the total amount of loans closed from the Closed Loan Pipeline report.

{¶ 56} Several of Waterstone's profit and loss statements were also attached to Danford's affidavit. Referencing these statements, Danford noted that Waterstone has always separated loan closing fees (reflected on the profit and loss statement under the category "Extraordinary Service Fee") from non-closing income. A review of the profit and loss statements confirms that Waterstone recognizes five categories of income, including Consulting Fee Income, NSF Fee Income, Processing Fee Income, Servicing Fee Income, and Extraordinary Servicing Fee.

{¶ 57} In response to Danford's affidavit, appellant submitted a supplemental affidavit, in which he attempted to refute Danford's bifurcation of Waterstone's business into loan processing services and loan closing services. Appellant stated that Waterstone

28.

does not act as a closing agent with any SBA loans, and thus such a practice is "immaterial to the classification of loans as pending or 'closed' by Waterstone." Again, appellant referenced an email he allegedly received on April 3, 2020, wherein Danford referred to Waterstone's income from PPP loan processing services as "closing fees." Appellant indicated that this classification of the PPP loan income was consistent with Waterstone's past practices under which "loans are considered closed by Waterstone when the conditions for earning its compensation have been met."

{¶ 58} Appellant also addressed Waterstone's use of Pipeline reports and Closed Loan Pipeline reports, insisting that the former report contains all loan prospects from inception to closing while the latter contains any loans from the Pipeline report that have been closed, which he defined as the point at which documents have been executed and funded. Moreover, appellant stated that the characterization of loans as closed "has nothing to do with who may have conducted the actual signing of loan documents," and the Closed Loan Volume metric "is entirely independent of Waterstone's internal accounting classifications for types of 'income.'"

{¶ 59} After appellant filed his supplemental affidavit, appellees filed their reply in support of their motion for summary judgment, to which they attached several more affidavits. First, Danford submitted a second affidavit, in which he stated that he reviewed appellant's affidavits and found "several inaccurate statements" contained therein. Contrary to appellant's assertion, Danford stated that Waterstone earns a closing fee on loans it closes irrespective of whether it acts as a closing agent. Danford explained

29.

that Waterstone's entitlement to a closing fee is based upon the work it performs for lenders, and since Waterstone does not provide closing services for PPP loans, it is unable to charge a closing fee with respect to those loans. Rather, Waterstone merely "earned a processing fee for the limited services provided." In sum, Danford insisted that "Waterstone did not close the PPP loans and therefore did not generate PPP closed loan reports."

{¶ 60} An affidavit from Parrino was also attached to appellees' reply in support of their motion for summary judgment. Parrino's affidavit was nearly identical to the one submitted by Danford.

{¶ 61} Appellees submitted six additional affidavits from executives who were employed at financial institutions engaged in the issuance of PPP loans for which Waterstone provided services. According to each of these individuals, Waterstone provided limited services in connection with PPP loans, and those services did not include "the drafting of loan documents, coordinating the closing with the Borrower, reviewing the executed loan documents or the funding of the loans."

{¶ 62} Upon our review of the foregoing evidence, it is clear that the parties dispute the extent of the work Waterstone performs in connection with PPP loans and whether such work amounts to closing the loans such that they would be included in Closed Loan Volume under the Purchase Agreement. Appellant insists that the work performed by Waterstone in connection with PPP loans was functionally equivalent to work the company performs on all other SBA loans, and he submitted affidavits to

30.

support that notion. Those affidavits include averments that Danford and Parrino acknowledged appellant's entitlement to share in the proceeds of PPP loans. On the contrary, appellees submitted affidavits to support their characterization of the work performed by Waterstone on PPP loans as mere processing services, not closing services.

{¶ 63} This factual dispute is material. With further development of the record, it may become clear that appellees' distinction between loan processing and loan closing is reasonable and supported by Waterstone's past practices. However, appellant's broad definition is also plausible under the terms of the Purchase Agreement. Since the meaning of Closed Loan Volume is subject to more than one reasonable interpretation, we find that the Purchase Agreement is ambiguous. Moreover, given the conflicting affidavits submitted by the parties in this case, and for the reasons already stated, we find that questions of material fact exist in this case, which prevent us from applying the Purchase Agreement to the PPP loans in question.

{¶ 64} Because of the conflicting evidence on the issue of whether closed PPP loans should have been placed on Waterstone's Closed Loan Pipeline, we find that summary judgment is inappropriate in this case. Therefore, the trial court appropriately denied appellant's motion for partial summary judgment, but erred in granting appellees' motion for summary judgment.

{¶ 65} Accordingly, we find appellant's first assignment of error not well-taken and his second assignment of error well-taken.

31.

### III.    Conclusion

{¶ 66} In light of the foregoing, the judgment of the Ottawa County Court of Common Pleas is affirmed, in part, and reversed, in part.  The trial court's order granting summary judgment to appellees is vacated and this matter is remanded to the trial court for further proceedings.  The costs of this appeal are to be split by the parties in accordance with App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.